CARROLL, CHAS., Judge.
This is an appeal by the mother of the child involved, from a decree granting a petition of the child’s paternal grandparents for his adoption.
The appellant and the child’s father were married in 1949. The subject of the adoption, .a boy who was six years old at the time of the suit, was born to them in 1952, *76 Under circumstances more fully outlined below, the child had spent almost all of that time in the care of the petitioners.
Petitioner Apostólos George Chakmakis is a doctor and resides in Miami with his wife to whom he has been married since 1916. He is engaged in the practice of medicine, and stated that his income is $300 per week. The petitioners own their home which they value at $18,500 subject to a $9,000 mortgage; and they are able to give proper care to the child. Petitioners alleged their ages to be 58 and 57, but the investigation of the State Welfare Board as shown by its filed report in the case found them to be aged 63 and 61 respectively-
The child’s father gave his consent to the adoption, but the mother, the appellant, opposed the petition. She answered averring that approximately a month after the birth of the child in Georgia the child’s father was inducted into the army, and at the request of the petitioners she and the child went to live with them in Miami; that she continued to reside with them for six months and turned over her allotment checks to them (a fact which petitioner Chakmakis denied). She further averred that the child’s father was discharged from the army after about six months, and that they continued to reside with his parents for about two months more, after which it was decided that the child’s father should go to Cuba to study medicine; that appellant went there with her husband but it was thought best not to take the child to Cuba; that appellant and her husband returned from Cuba some months later, and again lived for a time with petitioners in Miami; that certain separations occurred thereafter between appellant and her husband; that they were reconciled in 1954 and moved from Massachusetts back to Georgia; that in 1955 the petitioners and the child were living in New Jersey, and that appellant and her husband lived with them and the child part of that time. The mother averred that she had desired to have the child at all times but that it was the insistence of the child’s father and his inability to adequately provide for his family which had kept them apart. She averred her love for the child, and that she had kept in touch with him and visited him during the intervals involved. Appellant averred that she was now remarried and able financially to care for the child; and she moved the court to deny the adoption, and moved affirmatively for custody of her child.
Returning to the petition, the allegations as to the reasons for the adoption were that the child had been with the grandparents since he was approximately one week old; that the child’s parents, although attending school and operating a dance studio in Macon, Georgia, had not had a happy life; that the mother had separated herself from petitioners’ son on several occasions, including a departure in June of 1958, “making no attempt to come to Miami to see her son, said minor child.”[1] The petition then alleged the living conditions of the petitioners, and their ability to care for the child. The petitioners stressed their love for the child and their desire to continue him in their home as their own.
After the adoption suit had been filed in Florida in August of 1958, and before the appellant had received word of the adoption proceedings, she entered into an agreement with her husband on October 20, 1958, incident to their separation, which contained a provision relating to the child as follows:
*77 “Paul Chakmakis, the minor son of the parties hereto, has been with his paternal grandparents since an early-age. George Chakmakis agrees to support said child and each party hereto agrees that the other may have the right to visit said child at reasonable times and under reasonable circumstances, and each may have the right to have said child visit with them.”
While the above provision of the contract is not entirely clear, it is evident therefrom that it made no provision for any final award of custody to either party to the exclusion of the other party, nor did it provide for awarding custody to the paternal grandparents, but the agreement recognized that the grandparents had cared for the child since an early age, and it is reasonable to construe the agreement as presenting an assumption that the grandparents would continue to care for the child, because it does provide that each party should have the right to visit the child or to have the child visit him or her. At the same time, the agreement showed that the parties did not intend that caring for and supporting the child should be the undertaking and obligation of the grandparents, because in that agreement the child’s father obligated himself to support the child.
The decree entered in the State of Georgia which divorced the child’s parents recognized the agreement, but the decree made no award of custody, saying simply, “that there was one child, Paul Chakmakis, age six, born of said marriage. Plaintiff shows that there is no issue concerning the custody of said child and he is at present residing in Miami, Florida.”
The State Welfare Board filed a report in which it recommended that the adoption be granted. The report contained nothing adverse to the appellant, and noted her non-consent. The adoption suit was tried before the court, and there were present the petitioners, the appellant, her new husband William Pearson, and her former husband George Chakmakis. Testimony was given by the petitioner Apostólos George Chakmakis and by the appellant who was then Mrs. Pauline Pearson and her husband William Pearson.
The testimony reveals, and the decree makes no finding to the contrary, that the parents of the child did not abandon or lose interest in the child; that it was the child’s father who was primarily responsible for the child having remained with the grandparents instead of with him and his wife; and that there were practical reasons to prompt this young couple in that decision. It started when he went in the service; it continued when he went to medical school, and later when they went to Massachusetts to try to get a new start, and then was complicated when they had marital difficulties which occasioned at least two separations and reconciliations; further, when they found it necessary to return to Georgia and again try to make their way; all coupled with a willingness and ability on the part of the grandparents to care for and support the child; and interspersed with numerous visits with the child in the home of the grandparents and sometimes with the child being brought by one or more of the grandparents to the mother’s place of abode; that between times contact was maintained by telephone and correspondence and certain gifts were sent by the mother; that the adoption application of the grandparents came at the time of the final break-up between the parents of the child which was followed by their divorce; and that at the time of the adoption hearing the appellant had remarried, and was continuing in her operation of a dance studio in Macon, Georgia, with the assistance of her new husband who was a radio announcer; that they lived in Macon in a two-bedroom apartment, that they employed a maid, and that their combined income was $1,200 a month.
Certain of the facts as noted just above, particularly that there were visits between the parties several times a year were in conflict with the testimony of the petitioner *78 Apostólos George Chakmalds, but it should be noted that the appellant’s recital of the various occasions of these visits was in detail, and the petitioner’s contrary statements were general and there were no specific denials of particular visits or occasions; and further that the appellant’s full evidence on these matters was not contradicted by the petitioner Flora Wallene Chakmalds, nor by appellant’s former husband George Chakmalds, both of whom were present at the hearing, but who, according to the record, gave no testimony.
The court in decreeing the adoption made no finding of abandonment, and in the argument of this case before this court it was conceded by counsel for the parties that the mother had not abandoned the child, and that the court’s decision as indicated by the decree was not based on abandonment but solely on the ground that the court felt that it would be to the best interest of the child for him to be adopted by the paternal grandparents, rather than for the custody of the child to be granted to its mother. The mother of this child, by showing her fitness and that she had not abandoned the child, and upon showing justification for the child having been and remained in the care of the grandparents, established a right to her child, superior under the settled law to the claim of other parties seeking to adopt the child, even though they stood in the relatively close relationship of grandparents. Torres v. Van Eepoel, Fla.1957, 98 So.2d 735; Wiggins v. Rolls, Fla.1958, 100 So.2d 414; In re De Walt’s Adoption, Fla.App.1958, 101 So.2d 915; Roy v. Holmes, Fla.App. 1959, 111 So.2d 468; Carrier v. Vermeulen, Fla.App.1959, 114 So.2d 192. Cf. Steets v. Gammarino, Fla.1952, 59 So.2d 520; Foster v. Sharpe, Fla.App.1959, 114 So.2d 373.
As a basis for his determination that “the best interest of the child seems to be with the petitioners seeking his adoption,” the chancellor stressed the settled and secure position of the petitioners and the youth of the mother and her present husband, and the fact that their marriage was of short duration saying: “They, [the petitioners] are settled people. The grandfather is doing well in his profession, and the petitioners are able to give the child what is necessary for his material well-being as well as for his moral and educational welfare. No reflection is cast upon the mother or her present husband. They are younger people and engaged in operating a dance studio in Macon, Georgia. They have only been married about two months, and it is impossible to say at this time how that marriage will turn out. It is to be hoped that it turns out better than the mother’s previous marriage turned out.”[2]
In the case of Torres v. Van Eepoel, supra, Fla.1957, 98 So.2d 735, the Supreme Court reversed an adoption decree which the mother opposed. There, as here, the mother, due to certain adverse circumstances, had seen fit to permit her children to remain for a substantial period in the care of the petitioners, and the mother had remarried and was able to care for the children. In the Torres case the father had died. In this case the father, following the divorce of the parents, did not claim or demand custody of the child for himself.
In the Torres case it was recognized that the mother’s exhibited sense of irresponsibility and indifference to her children would not of itself justify the entry of the adoption decree. And “irresponsi *79 bility and indifference to the child” has been held to be less than abandonment, and may be excused. Roy v. Holmes, Fla. App.1959, 111 So.2d 468. Thus, while there was no finding in the instant case that the mother has been indifferent to the welfare of her child, if she so appears on the record to some extent it does not disqualify her parental claim, when con-cededly she has not abandoned her child.
In Torres v. Van Eepoel, supra, the Supreme Court said (98 So.2d at pages 737-738):
“It is unnecessary to elaborate upon our oft-repeated conclusion that a natural parent has a right to the custody of his or her children absent conduct or conditions that justify a deprivation of the right in the interest of the welfare of the children. This legal right is one that should not be lightly regarded. True the right is not absolute as against the actual welfare of the child. However, in order to deprive a parent permanently of the custody of his offspring the evidence relied upon should be clear and convincing. In re Whetstone, 137 Fla. 712, 188 So. 576. Conditions which might justify relieving a parent temporarily of the custody of his child would not necessarily support absolute and permanent transfer of the child to a stranger or even other near-kin. * * *
* * * * • =¡= *
“We have no doubt that the appel-lees are as devoted to these children as any aunt and uncle could be. Likewise it is certainly indicated that the children would be well cared for and well raised in the home of the appel-lees. Nevertheless, the record supports a conclusion that this mother has survived an exceedingly difficult period in her life and gives every indication now of straightening her course and justifying the custody and companionship of the children which she produced out of her own travail.”
Likewise, in Wiggins v. Rolls, supra, the Supreme Court said (100 So.2d at pages 415-416):
“We have held that adoption statutes should be construed to authorize the adoption of children by strangers only in cases where the natural parents consent or where there is proof that the child has been abandoned by its natural parents or where the parents have been permanently deprived of custody or, finally, that it is manifested to be the best interests of the child that the adoption be decreed after due notice to the natural parents. In re Whetstone, 137 Fla. 712, 188 So. 576.
******i
“We deem it appropriate to emphasize that we are here dealing with the matter of adoption as distinguished from the matter of custody. The adoption decree finally and for all times determines the rights of the objecting parent. It completely severs the relationship of parent and child. The matter of what might appear to be for the best interests of a minor in determining temporary or prolonged custody will not always support a decree of adoption. Fielding v. Highsmith, 152 Fla. 837, 13 So.2d 208; Browning v. Favreau, Fla.1952, 60 So.2d 186.
“We are not here losing sight of the rule that the courts will always consider first and primarily the welfare of the minor. At the same time we are of the view that due regard should be given to the rights of a natural parent. He should not be deprived of the privileges and responsibilities of parenthood against his consent unless in some fashion he has abandoned his offspring or has otherwise demonstrated that he is not a fit subject to continue to enjoy the privilege. * * * ”
In a similar case, in arriving at the same result as that which we reach on *80 this appeal the court of appeal in the second district, in an opinion prepared by Associate Judge Patterson said (Roy v. Holmes, supra, 111 So.2d at page 471):
“ * * * Parents are by no means required to face strangers to their blood on equal terms in contention for the parental rights to their children. The law is solicitous of the welfare of the child, and indeed where they are irreconcilable the welfare of the child will in proper cases be given primacy over the natural rights of the parent. Nevertheless we think that the rule quoted from the Torres case, supra, means that except in cases of clear, convincing and compelling reasons to the contrary the child’s welfare is presumed to be best served by care and custody in the natural family relation by its natural parents, and that transitory failures and derelictions of the parents might justify temporary deprivation of custody by appropriate proceedings but seldom the permanent deprivation of parental rights with the finality of an adoption decree.
“We have carefully examined the entire record in this case and are compelled to disagree with the Chancellor’s finding that the respondents have duly and effectively abandoned the child and thus forfeited their parental right. Abandonment in contemplation of the law of adoption has been stated generally to consist in conduct which evinces a settled purpose permanently to forego all parental rights and to relinquish all parental claims to the child. Cases on the question of what facts constitute such abandonment are collected in an annotation on the subject in 35 A.L.R.2d beginning at page 662. Our study of the cases there cited and the evidence in this case leads us to the conclusion that the respondents have been guilty of blameworthy neglect, indifference and irresponsibility for their child’s welfare but have never permanently abandoned their parental rights to the extent that they have lost the protection of the law against their permanent deprivation by the adoption here sought over their objection. Their indifference to the child’s financial support is certainly not to be commended, constitutes a gross imposition on the good offers of the petitioners and might well be the basis of a legal obligation for reimbursement. Nevertheless ‘judicial impatience with the vagaries of parents’ must not allow transitory derelictions to work a permanent forfeiture of the parental right and status. On this proposition see the cases collected under the topic ‘Failure to Support’, 35 A.L.R.2d 680.”
We have carefully examined the entire record in this case, and have concluded that it fails to present any “clear, convincing and compelling reasons” why the rights of the mother of the child should be overridden in favor of other parties seeking by adoption to permanently erase her privileges of parentage of the child. In so deciding we have not overlooked the years of care and devotion given to the child by the petitioners, and their ability and strong desire to continue to care for the child. However, the rights of the mother are on a higher level. Having never abandoned the child, and having now shown fitness and ability to care for him, she should not be deprived of the privileges and responsibilities of parenthood.
It is with reluctance that we reach a decision in conflict with the view of the learned chancellor in this case who decides questions of this character in the first instance. However, our view of this record leads us to the conclusion that under the controlling authorities on the point involved, the record does not sustain the decree for the adoption.
*81 The petition for adoption should have been denied, and the application of the appellant, as made in her answer, for custody of the child to be returned to her, should have been granted.
The decree appealed from is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.
Reversed and remanded.
HORTON, C. J., and PEARSON, J., concur.

. The petition for adoption was filed August 14, 1958. The appellant’s testimony, uncontradicted on this point, was to the effect that the petitioner Mora "Wallene Chakmakis came to Macon to see her with the child in May of 1958, shortly after appellant had separated from the child’s father, at which time she informed appellant that petitioners wished to adopt the child and asked her to sign a consent to the adoption which appellant refused to do.

. With reference to her previous marriage to the child’s father, the mother had testified, without contradiction, that her life with her former husband involved a series of beatings, as follows:
“Q. Yours was a very stormy marriage, wasn’t it, Mrs. Pearson, to George? A. Yes.
“Q. It was one of constant beatings, wasn’t it? A. Yes.
“Q. You suffered one beating before Mrs. Chakmakis? A. The last beating ho gave me was right in front of his own mother.
“Q. Was it a very healthy atmosphere? A. No.”