122 So.2d 423 (1960)
In re: Petition for ADOPTION of Sandra Eleanor PRANGLEY.
Arthur G. PRANGLEY, Appellant,
v.
Roland R. COMERFORD, Appellee.
No. 1701.
District Court of Appeal of Florida. Second District.
August 12, 1960.
Alan Lindsay of Alley, Maass, Rogers & Lindsay, Palm Beach, for appellant.
Robert C. Salisbury of Salisbury, Kaywell & Salisbury, Palm Beach, for appellee.
*424 ALLEN, Chief Judge.
The appellee, as petitioner in the lower court, filed a petition on May 11, 1959, seeking to adopt Sandra Eleanor Prangley, the ten year old daughter of his wife, Eleanor C. Comerford, by her previous marriage to the appellant-respondent, Arthur G. Prangley. Mrs. Comerford, the mother, consented to the adoption, but the respondent-father objected thereto. The petitioner asked that no investigation by the State Welfare Board be required and none was held. After the taking of testimony and filing of documentary evidence, the lower court entered an order granting the adoption which stated in part:
"The facts in this case are like those in Steets v. Gammarino, (Fla.-1952), 59 So.2d 520, where a decree of adoption was upheld over the objection of the father who had not contributed to his child's support for a number of years. In this case the father has not contributed to the support of the child in question in eight years, being in the meantime able to remarry and support his new wife and two children born to the second marriage. According to principles stated in the case referred to above, petitioner is entitled to a decree authorizing the adoption * * *."
Sandra, an only child, was born November 5, 1948. On April 9, 1951, the parties separated pursuant to a separation agreement with the mother taking custody of the child. The agreement, which was introduced into evidence, provided among other things that the father was to have custody of the child for three weeks during the summer of each year, with additional periods of custody to be agreed on after the child reaches the age of ten years; and in paragraphs three and four it provides:
"Third: The wife agrees to defray the expense of the care, education, support and maintenance of the Child, and to save the Husband harmless therefrom, except that the reasonable living expenses of the Child during the periods when she shall be in the custody of the Husband shall be defrayed by the Husband. The traveling expenses of the Child while going from the custody of the Wife to the temporary custody of the Husband and while returning to the custody of the Wife shall be shared equally by the Husband and the Wife. The Husband further agrees that he will contribute towards the education of the Child to the extent that he is able to do so.
"Fourth: The Wife possesses independent means, ample to provide for her own support, care and maintenance and for the care, maintenance, support and education of the Child. The Wife makes no claim upon the Husband for separate maintenance and support, nor for provision for the care, maintenance, support and education of the Child, and the Husband makes no financial claim upon the Wife, other than the agreements respecting property and property rights expressly included in this agreement. Each of the parties hereby releases and relinguishes any and all interest which he or she has or may have in the property and estate of the other, present and future, including property, real, personal and mixed, and property rights and rights incident thereto of every nature, except as hereinafter provided, and releases the right to share in any capacity in the estate of the other party upon the death of such party. Each of the parties agrees to execute, acknowledge and deliver at the request of the other or of the legal representatives of the other, all deeds, releases or other instruments as may at any time be necessary to bar and extinguish the rights and interests hereby released, and to carry out the intent of this paragraph."
The parties were divorced in June, 1951, and the separation agreement was incorporated into the final decree. At that time the father was in medical school, and with *425 the exception of two years in the Air Force, has continued his medical training up to the time of this proceeding in order to become a specialist in gynecology and obstetrics.
The father has not contributed to the support of the child and stated that as to his contribution to the child's education that he planned to assist in the college education for her when that time arrives. In the meantime he stated that he knew of no reason that she could not attend public school.
The father remarried in July, 1954, and his first child from that marriage was born in March, 1955, and his second child in January, 1957. After his discharge from the service in 1957, he earned $100 per month as an intern, $150 from the V.A., and received an average of $150-$160 per month from his parents. Aside from this monthly gift from his parents, the father's income record is as follows:

 1951 - none - intern.
 1952 - $20 per month - intern.
 1953 - $50 per month - residency.
 1954 - $50 per month through the summer.
 1954 - 1955 - $417 per month U.S.A.F.
 1956 - $500 per month U.S.A.F.
 1957 - $100 per month - resident surgeon
 plus $160 per month
 from V.A.
 1958 - $100 per month plus $160 from
 V.A.
 1959 - $150 per month plus $160 per
 month from V.A.

The father had custody of the child for three weeks in 1951, which he spent with her at his parents' home at Cape Cod when he wasn't on duty. He owned no home at this time. In 1952 he requested the three weeks' custody but the mother wrote back that he could not have custody unless he assured the mother that he would be with the child continuously. The father objected to these conditions and the end result was that the child did not visit her father that year.
The mother married the petitioner in February, 1952, and they and the child have lived in Palm Beach since that time. The father has been in Hartford, Connecticut, most of the period in question. In 1953 the child spent two weeks with her father at the paternal grandparents' home after which the father returned the child to her mother in Wisconsin. In 1954 the child visited her father for three weeks at the paternal grandparents' home after which he returned the child to her mother in Miami. In 1955 and 1956 the father was overseas with the U.S.A.F. during the summer months.
In 1957, after his discharge from the service, the father, for the first time, had a home of his own and planned a visit with his daughter to commence on August 5th. On July 27th the mother wrote warning that the child could not come unless she finished her summer reading and also demanded that the father send funds for the child's education immediately. On August 5th the father received a telegram stating that the child could not come north.
The next the father heard was a letter from the mother's attorney, on November 22, 1957, stating that there would be no more visits by the child unless the father started sending money for support and education of the child. The father's attorney replied that no support was required under the agreement.
During 1958 the father did not request the child to visit him. This was allegedly on the advice of his attorney and on the advice of his father, who is also an attorney. The father did not request custody for the same reason apparently during 1959. In addition, the father was informed that the child had been entered in summer camp and would not come north. On April 7th and April 9th, 1959, the father was requested to consent to the adoption which he refused by letter on April 21, 1959, *426 and on May 11, 1959, this adoption proceeding was instituted by the stepfather.
The father sent the child Christmas and birthday presents over the years plus cards, letters and photographs, with occasional Easter and Valentine cards.
Although no express finding was made by the lower court that the father had abandoned the child, the language of the chancellor in stating that the facts in the instant case are "like those in Steets v. Gammarino, (Fla.-1952), 59 So.2d 520," would indicate that the failure of appellant to contribute to the support of his child justified the adoption. In order to ascertain the correctness of the decree, we must first compare the facts of the Steets case with the instant case.
The parents in the Steets case were married in 1943 and the child was born in 1944. The husband was discharged from the Army in 1945 and immediately filed for a divorce. On the day of the filing of the divorce, the father obtained an agreement from the mother whereby temporary and permanent custody of the minor child was granted to the mother subject to the right of the father to visit the child at any time and to have his custody and support him during the summer months if he so elected. The agreement also provided that the father be relieved of any claim for alimony by the mother or support of the child. During 1946 a final decree of divorce was entered recognizing and approving the agreement between the parties as to alimony, custody and support of the minor child.
The mother remarried in 1948 and in 1950, with the mother's consent, her husband applied for permission to adopt the child. During the period since the divorce and the time of the filing of the petition for adoption, the father had visited his child once for about five minutes, contributed nothing to his support and evidenced no interest in the child. After a report by the State Welfare Board favorable to the adoption, and a report by a Special Master recommending the adoption, the chancellor entered a decree sustaining the father's exceptions to the Special Master's report and dismissed the petition for adoption with prejudice.
In reversing the cause, the Supreme Court stated [59 So.2d 521]:
"It is a very serious matter to take a child from the natural parent and place it in the hands of another but the courts of this country have not hesitated to do so when the child's welfare required. Here we are confronted with a case in which the natural father has never shown the slightest interest in his child until this suit was brought, at which time he was more than six years old and is now almost eight years old. He has contributed nothing to the child's support but made an agreement with his mother to relieve him of that, the child does not know him, his conduct for five years or more reveals a complete withdrawal from and neglect of parental duty or responsibility. He has never performed the natural and legal obligation to care for and support the child. What more is required to constitute abandonment on the part of a parent?"
In the instant case there was no investigation by the State Welfare Board. The father has shown a desire to have the child with him during the summer and the child has, in fact, visited the father in 1951, 1953 and 1954. The mother interfered with a proposed visit by the child with the father in 1952. During 1955 and 1956 the father's service with the Air Force overseas precluded the summer visits. In 1957 the dispute over support for the child arose and, upon advice of counsel, the father did not press the issue of the summer visits. The father continued to send letters, holiday cards, gifts and photographs regularly and the child, in turn, wrote endearing letters to her father. In a letter written to her father only three months prior to the adoption proceeding, the child stated *427 that she is waiting for him to "write the lawyer" so she can come up to see him and that his two sons by his second marriage, her half-brothers," are the sweetest two boys I have seen," and she closes her letter by sending her father her love.
The petitioner contends before this court that the father did not request custody of the child during 1957 and 1958 on the grounds that the father only wanted custody so long as he did not have to contribute to the child's support. It is noted that the father received a letter from petitioner's attorney in 1957 stating that the father could not have the child visit him without first contributing to the education, support and maintenance of the child. Upon the advice of his attorney, the father refused to send any support money on the ground that the judicially approved agreement between the parties specifically provided that the wife agreed to "defray the expense of the care, education, support and maintenance of the child, and to save the Husband harmless therefrom. * * *"
In Fekany v. Fekany, 118 Fla. 698, 160 So. 192, 194, cited by the petitioner for the proposition that such agreements are void as against public policy, the court stated in regard to the duty of the father:
"* * * On the question of support for the children, the record discloses that the defendant [father] is able to contribute to their support, and that they are in need of such contribution. The law makes it his duty to support them. (Citations omitted.) The father is not relieved of his duty even in the case of ample showing on the part of the mother to do so, and here there is no such showing."
There was no contract between the parties in the Fekany case nor was any reference to such an agreement discussed by the court.
The other Florida case cited by petitioner alleging the invalidity of the agreement is Lee v. Lee, 157 Fla. 439, 26 So.2d 177, 179. In the Lee case a separation agreement was entered into by the parties which contained a formula whereby both alimony and child support were to increase proportionately with the husband's changing income, but only up to a set limit. The husband's income rose to more than three times the maximum figure set forth in the agreement. The wife then sought a modification of the divorce decree incorporating the agreement on the ground that the maximum amount in the agreement was insufficient to maintain herself and the children. The Court held that she was estopped from seeking additional alimony but, as to the children's rights, said:
"* * * This condition, however, does not apply to the status of the two minor children during their respective minorities. We know of no rule of law by which a father may by contract obviate or impair his obligation to support his minor children, except possibly by a contract with the duly appointed Guardian of such children when such contract with such Guardian shall have been ratified and approved by a court of competent jurisdiction. Of course the extent of this obligation and manner of its enforcement is subject to being fixed by a court of competent jurisdiction."
We are not required to determine in the instant case whether such an agreement is valid or invalid therefore the above two cases are of little assistance. We observe, however, that the agreement in the instant case was entered into by both parties in good faith and it was confirmed and incorporated in the decree of divorce granted the parties in 1951. No appropriate proceeding has been brought since that time to alter and amend the agreement. The issue before this court is whether the father's reliance on the agreement, considered along with other factors, constitutes such an abandonment as to warrant the granting of the adoption over his objection as a natural parent.
*428 The case law of this state abounds with decisions setting forth the seriousness of severing the natural parent from the parental right and status. Adoption should be granted in this type situation only in the event that the natural parent consents or where there is proof that the child has been abandoned by its natural parents or where the parents have been permanently deprived of custody or, last but just as important, that it is shown to be in the best interests of the child that the adoption be granted. In re Whetstone, 137 Fla. 712, 188 So. 576. These stringent qualifications are not without wisdom for it must always be remembered that the adoption decree finally and for all time determines the rights of the objecting parent. It completely severs the relationship of parent and child, and should not be permitted unless the parent has, in some manner, abandoned his child or has otherwise demonstrated by his conduct that he is not a fit person to continue to enjoy the privileges and responsibilities of parenthood. Wiggins v. Rolls, Fla. 1958, 100 So.2d 414.
Abandonment in the field of our jurisprudence dealing with adoption consists of conduct which manifests a settled purpose to permanently forego all parental rights and the shirking of the responsibilities cast by law and nature so as to relinquish all parental claims to the child. Roy v. Holmes, Fla.App., 111 So.2d 468; see also cases collected in Annotation 35 A.L.R.2d 662. The Court observed in Steets v. Gammarino, supra, in finding the natural father guilty of abandonment that the father had never shown the slightest interest in his child until the time the suit was filed at which time the child was six years old. In 1 Proof of Facts, Adoption, 217, it is stated that the following elements would necessarily be included in establishing abandonment: leaving the child permanently or indefinitely in the care of others; failure to support the child, unexcused by the circumstances; legally executed consent to adoption; or a depraved and vagabond life during the period of the claimed abandonment.
The Supreme Court of Florida has upheld rather strictly the natural rights of a parent when confronted with adoption proceedings in which a stranger may be officially made the parent of a child in derogation of the natural rights of the parent.
In the case of Torres v. Van Eepoel, Fla. 1957, 98 So.2d 735, 736, the Supreme Court of Florida, in an opinion by Justice Thornal, reversed a final decree of adoption and held that the natural mother, who had remarried since the death of her first husband, had survived an extremely difficult period in her life and gave every indication of straightening her course and justifying the custody and companionship of her children, and the Court reversed the adoption decree as erroneous.
In the above case the Court pointed out that the legal right of a parent is one that should not be lightly regarded and that the Court to do so must have before it evidence that is clear and convincing.
In its opinion the Court said:
"The sum of the position of the appellees in support of their prayer for adoption of the children was that the appellant-mother had since the death of her husband neglected the children spirtually, physically and materially. It was their contention that the children were ill-kept and were denied the natural and normal love and affection of a mother. They further support their position with claims of immorality directed at the mother. We pretermit a catalog of the evidence for the reason that we find it unnecessary to summarize the testimony in view of the findings of the Chancellor which we hereafter mention. Suffice it at this point to record that in the ultimate the Chancellor decided that the decree favorable to the adoption should be entered. He supported his decree with certain findings which we feel lead to *429 the conclusion which we hereafter announce.
* * * * * *
"The Chancellor found that the conduct of the appellant and her now husband was such that it could not be ignored in the final determination of the welfare of the minor children involved.
"In the ultimate the basis of the decree of adoption as reflected by the findings of the trial Judge may simply be resolved into the factual conclusion that the mother had exhibited a sense of indifference to the children which of itself would not Justify the entry of the adoption decree but that this situation coupled with the alleged immorality as adequate to support the decree.
* * * * * *
"It is unnecessary to elaborate upon our oft-repeated conclusion that a natural parent has a right to the custody of his or her children absent conduct or conditions that justify a deprivation of the right in the interest of the welfare of the children. This legal right is one that should not be lightly regarded. True the right is not absolute as against the actual welfare of the child. However, in order to deprive a parent permanently of the custody of his offspring the evidence relied upon should be clear and convincing. In re Whetstone, 137 Fla. 712, 188 So. 576. Conditions which might justify relieving a parent temporarily of the custody of his child would not necessarily support absolute and permanent transfer of the child to a stranger or even other near-kin. In the instant case the children were delivered to an aunt by an employed `baby sitter' while the mother was absent from the city and immediately upon her return she was summoned before the Juvenile Judge on two days' notice. Her children were then ordered to be delivered to the appellees and the mother has ever since been denied even the privilege of visiting or seeing them. It is noted in passing that the Juvenile Judge did not undertake to place the children permanently in the custody of appellees for subsequent adoption. Nevertheless, within six weeks after appellees received the children this adoption proceeding was instituted.
* * * * * *
"Even accepting the factual conclusions of the Chancellor we are, therefore, compelled to the judgment that the decree of adoption was infected with error and must be reversed. The cause is remanded for further proceedings consistent herewith."
In the case of In re DeWalt's Adoption, Fla.App. 1958, 101 So.2d 915, the lower court had granted the adoption of a nine year old child by the grandparents over the objection of the natural mother. This court, in remanding the cause for the taking of additional testimony to determine if the natural mother was an unfit person to have custody of the child, quoted from Wiggins v. Rolls, Fla. 1958, 100 So.2d 414, 415, an opinion also written by Justice Thornal, wherein a stepfather was seeking to adopt his wife's child, the following language [101 So.2d 921]:
"`We deem it appropriate to emphasize that we are here dealing with the matter of adoption as distinguished from the matter of custody. The adoption decree finally and for all time determines the rights of the objecting parent. It completely severs the relationship of parent and child. The matter of what might appear to be for the best interests of a minor in determining temporary or prolonged custody will not always support a decree of adoption. Fielding v. Highsmith, 152 Fla. 837, 13 So.2d 208; Browning v. Favreau, Fla. 1952, 60 So.2d 186.
"`We are not here losing sight of the rule that the courts will always consider first and primarily the welfare of the minor. At the same time we are of the view that due regard should be *430 given to the rights of a natural parent. He should not be deprived of the privileges and responsibilities of parenthood against his consent unless in some fashion he has abandoned his offspring or has otherwise demonstrated that he is not a fit subject to continue to enjoy the privilege. In Steets v. Gammarino, Fla. 1952, 59 So.2d 520, a case cited by both parties, we held that the conduct of a father in completely ignoring his child, failing to support him and totally disregarding every aspect of parental responsibility was sufficient to establish an abandonment that would justify a decree of adoption favorable to a stepfather. However, applying the rule of the last cited case in converse, we do not find in this record any element of abandonment by the natural father. * * *
"`* * * Likewise, we find little if anything in this record to lead us to the notion that the ultimate overall long range welfare of the minor necessarily requires the adoption when balanced against the natural rights of the parent in this instance.'"
In the case of Roy v. Holmes, Fla.App. 1959, 111 So.2d 468, 470, this court reversed an adoption decree in a case where the parents of the child were hospitalized for a period of time and were not able to care for the child. The custodians of the child, at the end of two weeks of caring for it, petitioned the court and obtained an additional six months period of custody. After this six month period, the petitioners sought permission to adopt the child. The parents did not agree to this but did agree that the petitioners could keep the child longer and, in the meantime, the parents agreed to contribute to its support in such amounts as they were able, there being no fixed amount agreed upon. The parents, however, failed to contribute anything to the child's support. Subsequently, a petition was filed with the Juvenile Court which court ordered the father to pay to the petitioners $10 per week to be applied on the arrearage of $250. However, $62.50 was paid on such support order and the evidence shows that the order was entirely disregarded over the following years while the petitioners retained custody of the child.
The Court, in its opinion, said:
"The Chancellor found that the petitioners are morally fit, proper and stable parties to adopt the child. He did not make the specific finding that the respondents were unfit morally or otherwise to have the care and custody of their child. Instead, his approval of the adoption was based upon the findings that the natural parents had `duly and effectively abandoned' the child; and that it would be prejudicial to the child's welfare to remove it from the home in which it is happy and well adjusted and `place him with the natural parents and into an atmosphere the future of which is unknown and at best purely conjectural and one which, from what can be gleaned of the past in no wise recommends itself to the Court.'
* * * * * *
"* * * Certainly adoptions in most cases serve a laudable and beneficial purpose but where there is a choice to be made between a natural and an adopted status the welfare of the child strongly favors the former, absent strong and compelling reasons to the contrary. Parents are by no means required to face strangers to their blood on equal terms in contention for the parental rights to their children. The law is solicitous of the welfare of the child, and indeed where they are irreconcilable the welfare of the child will in proper cases be given primacy over the natural rights of the parent. Nevertheless we think that the rule quoted from the Torres case, supra, means that except in cases of clear, convincing and compelling reasons to the contrary the child's welfare is presumed to be best served by care and *431 custody in the natural family relation by its natural parents, and that transitory failures and derelictions of the parents might justify temporary deprivation of custody by appropriate proceedings but seldom the permanent deprivation of parental rights with the finality of an adoption decree.
"We have carefully examined the entire record in this case and are compelled to disagree with the Chancellor's finding that the respondents have duly and effectively abandoned the child and thus forfeited their parental right. Abandonment in contemplation of the law of adoption has been stated generally to consist in conduct which evinces a settled purpose permanently to forego all parental rights and to relinquish all parental claims to the child. * * *"
After a careful review of the cases from this and other jurisdictions and a thorough examination of the evidence presented in the instant case, we conclude that this cause must be reversed. The father in this case apparently relied on the written agreement of the mother, which agreement was confirmed in the decree of the lower court, and her financial ability to support the child until the father completed his medical training. We see nothing in his so doing that evidences any abandonment of parental care and duty. We do not mean to hold that as between the state of the child and the father that he may abandon the support of his child by contracting with the child's mother that she, due to her financial condition, shall support the child or children until certain stated times since the father cannot contract away his duty to support his child. But, in a situation such as in this case, where the mother was a woman of wealth and the father a medical student, we see nothing morally wrong in the mother assuming the custody and support of the child until the father has completed his medical education at which time a modification of the duty to support may be presented and, under certain circumstances, a new determination of custody could be considered. We do hold that the acts set forth in this record do not constitute such an abandonment as serves to deprive this father of his status as the parent of a child who is the subject of this proceeding.
This is one of the most difficult areas of law for a chancellor or for an appellate court. The child's manifested love for her father and the father's love and desire to have his child visit him throughout the years certainly does not sustain abandonment on the record presented here. Having concluded that the evidence fails to establish abandonment, we also observe that although the child at the time this suit commenced was ten years old, she did not appear nor was her testimony in any form offered in the cause, even though she had been in the custody of her mother and stepfather during the time preceding the taking of testimony below. There was no investigation by the State Welfare Board and thus very little evidence was presented on the question of what would be best for the child.
On the basis of this record and for the reasons assigned this cause is reversed and remanded with directions to dismiss the adoption proceedings.
Reversed.
SHANNON, J., and OVERSTREET, MURRAY W., Associate Judge, concur.