196 So.2d 784 (1967)
In re ADOPTION OF Bradley LAYTON.
Arthur LAYTON, the Natural Father of the Adoptee Herein, Bradley Layton, a Minor, Appellant,
v.
Uberto ORVIETO, Appellee.
No. 66-347.
District Court of Appeal of Florida. Third District.
March 21, 1967.
Rehearing Denied April 12, 1967.
Guilmartin & Bartel, Miami, for appellant.
Wepman & Wepman, Miami, Ely Katz and Michael Salmon, Miami Beach, for appellee.
Before HENDRY, C.J., and PEARSON and SWANN, JJ.
HENDRY, Chief Judge.
Arthur Layton, the natural father of Bradley Layton, appeals from a final decree granting the petition for adoption of Uberto Orvieto, the child's step-father.
Bradley Layton was born in New York on January 11, 1957, to Arthur and Barbara Layton. The Laytons separated on September 30, 1958 and Barbara and the child came to Florida. On November 15, 1958, *785 they moved into an apartment on Miami Beach where they remained until November, 1959. In December, 1958, Arthur visited his wife. He testified that he gave her several hundred dollars and they agreed she would return to New York. Barbara testified that he gave her no money and that when she requested money to buy the child something, he refused. Prior to this meeting, Arthur had given her $30.00 at the time of separation and a week later had sent her $50.00. There is no conflict in the testimony that subsequent to this meeting Arthur gave no money to his wife for child support or otherwise. It is his testimony that Barbara is independently wealthy.
On July 6, 1959, Barbara filed a complaint for divorce alleging non-support since separation. The final decree of divorce was entered on September 18, 1959. As service had been by publication and Arthur did not appear, the decree did not provide for child support. Custody of the child was granted to Barbara.
On November 19, 1959, Barbara married the petitioner Uberto Orvieto. The petition for adoption was filed March 4, 1965. Barbara filed her consent to the adoption. Arthur filed his answer and objections to adoption. Uberto is engaged in the dress manufacturing business in Dade County. At the time of the final hearing the family group consisted of Uberto and Barbara, Sharlien, 12 years of age, Charles, 11, Bradley, 8, Rachel, 4, Samuel 18 days old. Uberto is the natural father of Sharlien and Charles, and Barbara has adopted these children. Rachel was adopted by both Uberto and Barbara, who plan the adoption of Samuel. The State Welfare Board, after finding that Bradley has enjoyed a close, loving relationship with the petitioner and that the family group gets along well together, recommended that the adoption be approved. A court-appointed psychiatrist testified that the relationship between Bradley and the petitioner was "a near ideal relationship" and that there was "a great deal of mutual spontaneous expression of affection." A second psychiatrist, whose appointment was requested by Arthur in companion proceedings, said of the petitioner, "I think he is one of the finest fathers I have ever met." Both psychiatrists testified that the adoption was in the best interests of the child.
The evidence is in conflict as to why Arthur had neither seen his son nor contributed to his support since his separation from Barbara. Arthur lives and is a practicing attorney in New York. He testified that subsequent to his divorce from Barbara, he came to Florida a number of times to try and see his son but Barbara concealed the child's whereabouts. In January, 1961, he mailed a present to his son which was sent to the office of Barbara's attorney of record in the divorce proceedings. He also sent a telegram, addressed to Mrs. Orvieto wishing his son a happy birthday. Although he knew the attorney's address and Mr. Orvieto's business address, he made no attempt to further communicate with his son.
Early in 1961, Barbara's attorney had a number of conferences with Arthur and his attorneys. A request was made for $50.00 per week child support. When Arthur protested that this was too high, financial data was requested of him. Arthur was also informed of an operation that Bradley had undergone costing $795.00 and his reaction was that the Orvietos had insurance and could take care of the bill. Barbara's attorney drew a proposed agreement containing visitation privileges as well as support obligations, the amount left blank because of the negotiations. However, no financial data was ever furnished nor did Arthur agree to make any payments.
On April 10, 1963, Arthur petitioned the court to modify the final decree so as to entitle him to reasonable visitation rights. At this time, Bradley did not know that Mr. Orvieto was his step-father, therefore, the court appointed a psychiatrist to determine the effect of visitation rights on the child. At the hearing on April 17, *786 1963, the psychiatrist testified that he had not had enough time to determine the effect upon Bradley, who was then six years of age, of learning of his natural father. Thus, the court required the Orvietos to make the child available for further consultation with the psychiatrist when requested and at the expense of Arthur. However, Arthur never requested further consultation.
In February, 1965, Arthur again sought to set up visitation for a spring visit in 1965. At this time, the court-appointed psychiatrist recommended that Bradley be told of his natural father. On March 26, 1965 the court amended the final decree of divorce to grant visitation rights, but declined to define such rights until after the child was informed of his father. The petition for adoption had been filed before the aforementioned order. In its report in the adoption proceedings, the State Welfare Board said of Arthur, "He appears to be an emotionally immature individual who has not been able to assume the responsibilities of parenthood and his personal desires seem to be more important to him than the welfare of his son."
The Supreme Court in Wiggins v. Rolls, Fla. 1958, 100 So.2d 414, set down requirements for adoption where the natural parent objects. Justice Thornal speaking for the court said at page 416:
"We are not here losing sight of the rule that the courts will always consider first and primarily the welfare of the minor. At the same time we are of the view that due regard should be given to the rights of a natural parent. He should not be deprived of the privileges and responsibilities of parenthood against his consent unless in some fashion he has abandoned his offspring or has otherwise demonstrated that he is not a fit subject to continue to enjoy the privilege."
It is uncontradicted that Bradley's natural father had failed to support the child. While this alone may not be sufficient to constitute abandonment, it is a relevant factor when unexcused.[1] Arthur's excuse is that Barbara is financially independent. Contrast this with the petitioner's complete support of the child since he was about two years of age. In 1963 when Bradley was six, Arthur conditioned support upon visitation rights although in 1961 he refused payments when visitation privileges were offered. Since his separation from Barbara, Arthur has but once attempted to communicate with his son, sending him a telegram and a present. While his attempt at visitation rights in 1963 was commendable, he actually did nothing to prosecute the petition. The court ordered that the child be available for consultation with a psychiatrist at Arthur's request, but no request was ever made. It was not until 1965, at which time the Orvietos requested that the psychiatrist see the child, that the psychiatrist felt that the child should be informed of his natural father. Taking into consideration Arthur's request for visitation privileges, the record is still permeated with his indifference toward the child. This also appears in the State Welfare Board's report which concludes that his personal desires appear more important than his son's welfare. We must again contrast this with the relationship established between the child and the petitioner as related by the State Welfare Board and court-appointed psychiatrists.
Based on our review of the record, it is our belief that it is in the best interests of the child that the adoption be granted and that the evidence is sufficient to support a finding of abandonment.[2]
*787 Accordingly, the decree appealed is affirmed.
Affirmed.
PEARSON, Judge (dissenting).
It is my view that the majority has quoted the controlling law and then failed to follow it. Wiggins v. Rolls, Fla. 1958, 100 So.2d 414 certainly holds: "He (the natural father) should not be deprived of the privileges and responsibilities of parenthood against his consent unless in some fashion he has abandoned his offspring or has otherwise demonstrated that he is not a fit subject to continue to enjoy the privilege."
It is not my purpose to go into an extended discussion of the facts, but there are certain parts of the record which deserve emphasis. The natural father was granted reasonable visitation rights in a judicial decree dated March 25, 1965,[1] in which it was stated that Arthur Layton is "a fit subject to continue the privilege". It should also be noted that the petition for adoption had no allegation of abandonment, unfitness, or any other factor which would disentitle the natural father from continuing his parental relation. The final decree of adoption made no finding of abandonment, but stated that the adoption would "promote the best interests of the child."[2]
I must admit a strong suspicion of the power of the State to take away a parental right because the "best interest" of the child will be promoted. It has been held that what might appear to be for the best interest of a minor in determining temporary or prolonged custody will not always support a decree of adoption. See Wiggins v. Rolls, Fla. 1958, 100 So.2d 414; Torres v. Van Eepoel, Fla. 1957, 98 So.2d 735. I feel that the adoption decree severed forever the relationship of father and son without any finding of fact which would be sufficient to deprive a natural parent of his parental rights.
The majority appears to base its affirmance upon a showing of abandonment. However the record clearly shows that the whereabouts of the child and mother were deliberately concealed from the natural father. It has been held that the legal right of the parent is one that should not be lightly regarded, and the court, in order to enter a decree of adoption by another, must have before it evidence that is clear and convincing. In Re Adoption of Prangley, Fla.App. 1960, 122 So.2d 423. The evidence in the instant proceeding does not convey any clear showing of abandonment. Since I see no convincing and compelling reason why the natural father should be deprived of his parental right, I would reverse. See In re Adoption of Chakmakis, Fla.App. 1959, 115 So.2d 75; Roy v. Holmes, Fla.App. 1959, 111 So.2d 468; In Re Adoption of Prangley, Fla.App. 1960, 122 So.2d 423; Meyers v. Shifrin, Fla. App. 1962, 146 So.2d 770.
It should also be noted that the effect of such reversal would not be to take the child from his present home but would carry forward the decree of the chancellor in the divorce suit. That decree found that the father had a right to be with his child at such reasonable times and places as the court might find appropriate.
NOTES
[1] In re Adoption of Prangley, Fla.App. 1960, 122 So.2d 423.
[2] Streets v. Gammarino, Fla. 1952, 59 So.2d 520; See: In re Adoption of Christian, Fla.App. 1966, 184 So.2d 657; In re Adoption of Corcuera, Fla.App. 1962, 145 So.2d 493.
[1] The adoption procedures were filed one week later. The opinion of the representative of the State Welfare Board stated that "He appears to be an emotionally immature individual who has not been able to assume responsibilities of parenthood and his personal desires seem to be more important to him than the welfare of his son." This opinion was dated September 24, 1965. It does not seem sufficient to nullify the decree. See In re De Walt's Adoption, Fla.App. 1958, 101 So.2d 915.
[2] The decree of adoption finds: "* * * the Court finding that the equities are with the Petitioner; and that the Statutory procedure has been followed; and it further appearing unto the Court that the best interests of the child will be promoted by granting the Petition for Adoption; and that the Petitioner is a fit and proper person to adopt the said child, and that the child is suitable for adoption by the Petitioner, and that the said child lives and resides with Petitioner and the child's natural mother. * * *"