## IN THE MATTER OF THE ADOPTION OF JANE DOE, A FEMALE MINOR CHILD.

### No. 3073.

ARGUED DECEMBER 4, 1957.            DECIDED DECEMBER 13, 1957.

RICE, C. J., MARUMOTO, J., AND CIRCUIT JUDGE HEWITT IN PLACE OF STAINBACK, J., ABSENT.

OPINION OF THE COURT BY MARUMOTO, J.

This is an appeal from a decree of adoption entered by the judge of the juvenile court of the first circuit without the consent of the mother.

In this opinion the names of the parties are not used, pursuant to rule 7 (h) (1) of the rules of this court applicable to confidential and restricted matter. The minor with respect to whom the petition was filed is referred to as the "child," and the natural parents and the persons who filed the petition are referred to as "father," "mother," and "petitioners" or "male petitioner" and "female petitioner," respectively.

The principal, and the sole substantial, question raised on this appeal is whether the mother abandoned the child or voluntarily surrendered the care and custody of the child to another for the statutory period.

The child was born of a tempestuous union. It is unnecessary to recount the details of the domestic strife between the father and the mother. Suffice it to say that the child is an innocent victim of the discord. When the child was born on November 1, 1947, a suit for divorce by the mother against the father was pending, and an interlocutory decree of divorce had already been entered. After

the birth of the child, there were sporadic efforts at reconciliation, all of which failed, and a final judgment of divorce was entered on December 30, 1948. The final judgment continued in effect the provisions of the order and decree modifying the interlocutory decree of divorce entered on April 9, 1948, which awarded the sole care, custody and control of the child to the mother.

During the fourteen-month period that intervened between her birth and the final divorce of her parents, the child was under the personal care of the mother not more than two months. She was with the mother about one month after her birth and about another month in July and August of 1948. During the rest of the period, except for a short stay in a juvenile home in San Jose, she was in the care of a foster home in Palo Alto, California. The mother testified with regard to the home as follows: "I didn't like the condition of the home when I saw the child. I didn't like the small basket she was in. I didn't like the dirty fireplace. I was very much upset about everything."

In August 1948, when the child was less than ten months old, the mother sent the child back to the foster home in Palo Alto, despite the fact that she had the sole legal custody of the child and despite the fact that she did not like the condition there, according to her own testimony.

On December 15, 1948, the father, who was then employed in Medford, Oregon, received a telegram from the foster home, stating that the child could no longer be taken care of at the home. In the circumstance, the father found a foster home in Medford, and, with the consent of the mother, took the child there on Christmas eve of 1948.

After the child was taken to Medford, the mother did not see her until April 1949. On March 16, the mother sent a telegram to the father from Alta, Utah, stating that she would be married on April 2 and would be in Medford on April 8 to see the child. She appeared in Medford with

her fiance on the day mentioned in the telegram. She was then unmarried. Later she married but the marriage ended in annulment. On the visit she saw the child a few times but did nothing to assert her legal right over her.

After the mother's visit, the foster home in Medford indicated an unwillingness to take care of the child any further. The father then placed the child in the care of a foster home in Ashland, twenty miles from Medford. At that time the father had a job in Ashland. He was not satisfied with the foster home in Ashland. He therefore made an arrangement with the petitioners for the care of the child. The male petitioner was then, and now is, employed at a school in Honolulu. The female petitioner is the wife of the male petitioner and sister of the father.

The arrangement with the petitioners involved the transportation of the child on a trans-Pacific flight from Portland, Oregon, to Honolulu. Preliminary to sending the child on such flight, the father, on April 20, 1949, filed a petition in the circuit court of the State of Oregon, for Jackson County, to have the child adjudged a dependent ward of the juvenile court, "in order to insure a secure plan of care for said minor."

Pursuant to such petition a "Temporary Commitment" was entered on May 13, 1949, under section 93-610, Oregon Laws 1940, by which the child was temporarily committed to the care, custody and supervision of the petitioners until the further order of the court. The mentioned section of the Oregon Laws 1940 provides: "Temporary commitments shall be made when the court for good and sufficient reasons decides that final adjudication of the case must be delayed, or that the child or children involved can reasonably be expected to soon return to ordinary home conditions in their own families; and in temporary orders of commitment guardianship of the persons of the children shall remain with the court, and children under such orders may

be recalled by the court for further action at any time."

The mother had notice of the father's plan. She did nothing to oppose it. On April 25, 1949, the father wrote to the mother: "Please be advised that I have taken action to have the legal custody of our daughter transferred from you to me." On May 3, he advised the mother that at an informal hearing he was given temporary custody of the child pending a formal hearing, which was tentatively scheduled for the following week, and stated: "If I am granted custody I am sending [the child] to Honolulu as soon as transportation can be arranged." On the following day, the father advised the mother that the formal hearing, originally scheduled for the following week, was moved up and was held that morning, that he was awarded the custody of the child, and that the child would leave for Honolulu as soon as transportation was arranged.

On this appeal the mother complains of lack of proper notice to her of the formal hearing. The mother received the father's letter informing her of the result of the formal hearing on May 7. At that time she did not complain about lack of notice. Instead, she inquired of the father about the day and time of the child's departure and the exact flight number of the airplane on which the child was scheduled to leave. Upon receiving the requested information, she sent a telegram to the father, stating: "THANKS FOR INFORMATION UNABLE TO MAKE IT." However, she proceeded to Medford a few days before the child's departure.

The child left Medford, in the company of her father for Portland, there to be placed in the care of an airline for a long trans-Pacific flight unaccompanied by either parent. This was on May 18, 1949, when she was only eighteen months old. The mother saw the child leave Medford. She did not go to Portland. Perhaps, enough of the "spark of maternal care" that the attending physician

tried to kindle in the mother at the time of the child's birth remained to kindle in her a desire to see her child as she departed from Medford. The spark was not strong enough to kindle in her an interest in accompanying the child to Portland to see that she was properly placed on the trans-Pacific airplane.

When the child left Medford, the mother knew that her ultimate destination was the petitioners' home in Honolulu. However, she did not contact the petitioners until January 22, 1953, when she addressed a letter to the female petitioner, in which she wrote: "Being it will be some time before I am able to care for [the child], I'm wondering if I can assist you in any way financially." This was three years and eight months after she last saw the child. The female petitioner did not answer this letter.

On November 23, 1954, one year and ten months later, she again wrote to the female petitioner. In the letter she did not demand the immediate return of the child, but made a threat of legal action if the child was not eventually returned. She wrote: "First — I want the return of [the child], but not to disturb her schooling at present. To see her and slowly to understand her true parent. I'm willing to share and not divorce her completely from you, but to understand her heirtage [sic]." She also wrote: "Please consider seriously what I have written, and may I have an acknowledgment of some sort? If I do not hear from you by Dec. 15, I will assume your silence means for me to take legal action." This letter was also unanswered. She did not take any legal action.

On May 27, 1955, the petitioners filed the instant petition for the adoption of the child. The father gave his consent. The mother did not. Our statute requires the written consent of each of the legal parents who has not abandoned the child for a period of six months or who has not voluntarily surrendered the care and custody of the

child to another for a period of two years or over. (R. L. H. 1945, § 12271; R. L. H. 1955, § 331-2)

The judge of the juvenile court held an exhaustive hearing at which the father and the mother testified. They were questioned extensively both in direct examination and cross-examination. The judge was not impressed with the reason given by the mother as her excuse for inattention to the child. He found that the mother had abandoned the child for a period of more than six months and had voluntarily surrendered her to the petitioners for the statutory period. On the basis of such finding, he granted the petition without requiring the written consent of the mother.

The judge of the juvenile court exercises the powers of a circuit judge at chambers in adoption cases. (R. L. H. 1945, § 9648, 9655; R. L. H. 1955, § 215-18, 215-25) This court accords great weight to a finding of a circuit judge at chambers, particularly where the finding depends upon the credibility of witnesses, and will not disturb such finding without sufficient reason. (*Kapiolani Maternity and Gynecological Hospital* v. *Wodehouse,* 33 Haw. 846; *In re Herlihy,* 33 Haw. 106; *In re Pedro,* 32 Haw. 751)

In this case, we see no reason for disturbing the finding of the judge.

*Adoption of Tom Minors,* 37 Haw. 532, states the law in this jurisdiction with respect to abandonment in connection with adoption. There it is held, first, that a parent is deemed to have abandoned his child so as to render his written consent to the adoption of the child unnecessary, if he neglects to perform the natural obligations of care and support, and withholds his presence, care and affection from the child, for the statutory period, and, second, that where the parent is shown to have abandoned his child but nevertheless contests a petition for adoption on the ground that he has not given his consent the paramount consideration is the welfare of the child.

The holding in the *Tom* case with respect to abandonment is equally applicable to voluntary surrender. Both abandonment and surrender involve the relinquishment of a right. Surrender differs from abandonment only in that it implies the relinquishment of a right to another. In abandonment the relinquishment of a right is not to any particular person. (*Hogan* v. *Gaskill,* 42 N. H. Eq. 215, 6 Atl. 879; *Justice* v. *Burgess,* 244 Ky. 774; 52 S. W. [2d] 720)

It is not necessary to discredit the mother's testimony to sustain the finding of the judge. When the mother's testimony is considered in connection with the documentary evidence in the case, no conclusion is possible other than that she voluntarily surrendered the child to the petitioners.

Apparently the father wrote to the female petitioner shortly after the birth of the child inquiring whether she would take care of her. In answer to the inquiry, the female petitioner wrote to the father on February 4, 1948, as follows: "We will have to know the legal terms. The mother should have no claim. I don't mean we have to adopt the baby — but if we take her into our family it will have to be without reservation. Of course you may not wish to give her up completely, but we will have to decide all this first. I cannot have happen to me what happened to Aunt Zem — have a child and then have my heart broken to have her taken from me. So you see — if we don't take her forever it will all have to be worked out."

This letter was introduced in evidence by the mother herself. Her testimony indicates that she knew its contents before the child went to the petitioners. She testified as follows:

"Q You felt it was a good idea that she go to [the petitioners]?

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

"A  I knew she needed care. I also knew I needed time to recover.

"Q  But you acquiesced, you made no objection to her going to Honolulu?

"A  [The female petitioner] made it very clear she wanted no interference from me under any circumstances, or she wouldn't care for [the child].

"Q  You knew [the female petitioner] didn't want to take [the child] unless she was assured that there would be no interference from you, is that right?"

Thus, the mother knew the conditions under which the petitioners would accept the child. Yet, she permitted the child to go to the petitioners. She explained her failure to contact the petitioners after the child went to them as follows:

"Q  You knew how to contact [the petitioners] during this entire period of time, didn't you?

"A  I also recall that [the petitioners] did not want me in any [sic] interfering in any way, or contacting them. I think they made that quite clear."

There is also in evidence an undated letter from the mother to the father on a letterhead of The Clift Hotel, San Francisco, which contains the following paragraph: "I do hope your sister will do well by [the child]. She showed signs of needing a tremendous amount of affection security, and a strong will of her own. I hope that in her efforts to do well by [the child], she won't break her spirit or thwart her personality by making her take second place. Naturally a mother's instinct is for her own child's consideration first. As [the child] gets older I do hope she won't feel these things. And I hope her neck will right itself so she won't have added complexes." There is a dispute whether this letter was written before or after the child left Medford. The dispute is immaterial. The letter shows the concern of the mother for the child in her new

environment. At the same time it definitely indicates that the mother was leaving the future of the child entirely to the petitioners.

The evidence, as set forth above, places this case squarely within the framework of the *Tom* case as applied to voluntary surrender.

The mother argues that there is no voluntary surrender in this case because the petitioners obtained the custody of the child under a commitment from an Oregon court. She cites *Adoption of Virginia de Silva,* 32 Haw. 443.

In the *de Silva* case, the mother obtained a divorce from the father, but consented to the award of the custody of the child to the father subject to a right of visitation. After the death of the father the grandparents of the child filed a petition for her adoption. The mother did not consent. The grandparents took the position that the mother's consent to the adoption was unnecessary because she had voluntarily surrendered the child to the father when she consented to the award of her custody to the father in the divorce case. The circuit judge denied the petition on the ground that the mother's action in the divorce case did not constitute voluntary surrender as that expression is used in the adoption statute. This court sustained the circuit judge. In that case the mother had exercised her right of visitation from time to time. The circuit judge stated in his decision: "The conduct of the mother in visiting her child, when permitted, during the period that the child was in the care and custody of its father and its grandparents, indicates as plainly as could be indicated that she did not contemplate or intend that the consenting to the care and custody award in the divorce decree should be construed as a voluntary waiver of her status as a parent."

Thus, the *de Silva* case is not authority for the proposition that there can be no voluntary surrender when

there is a custody order in existence. There may be a voluntary surrender even when a child was originally taken away from a parent by court order. (*In re Maxwell* 117 Cal. App. [2d] 156, 255 P. [2d] 87) Whether there has been a voluntary surrender is a question of fact.

Here, the temporary commitment of the child to the petitioners by the Oregon court was made in the mother's absence. But the mother made no effort to have it set aside. In fact she acquiesced in it. When she went to Medford at the time of the child's departure, she personally spoke to the judge who made the commitment. She testified about her meeting with the judge as follows: "Well, after I received the letter from my husband stating that they already had the hearing and they awarded the custody of the baby to him, I got on the plane and went to Oregon, and after some conversation with the Judge I decided that I would wait, that I would go along with [the father's] idea of letting [the child] go to Hawaii, and I said that I would wait until I was either completely well or remarried, and that I intended to get her as soon as I was either well or remarried."

The significant statement in the above testimony is, "I would wait, that I would go along with [the father's] idea of letting [the child] go to Hawaii." If the mother really intended to reclaim the child, that intention remained unexpressed for three years and eight months. When the mother wrote to the female petitioner with a vague offer of financial assistance, it was too late. By then the statutory period of two years had expired. Thereafter the welfare of the child became the paramount consideration.

There can be no question where the best interest of the child lies. On the one hand are the petitioners, who, despite their modest means, undertook the care of the child when she was eighteen months old. They have furnished the

child the only real home that she has known and have lavished upon her their love and affection as though she were their own. On the other hand is the mother whose pattern of impulsive and self-centered actions in the past furnish no basis of emotional, or even financial, security for the child in the future. Admittedly, she is of ample means. After parting with the child at Medford, she had the time and the means to take a trip to Europe which extended over a year and took her as far as Istanbul. She also had the time and the means to take a trip to Mexico. She says that these trips were taken for her health. If the mother needed medical care, so did the child. She knew that the child had a neck ailment. She expresses concern about this condition in her letter to the father and also in her letter to the female petitioner. She says that she has spent in excess of $15,000 in medical expenses for herself. She has not spent anything for the cure of the child. She protests her love for the child. The protest is hollow if her past actions are an indication of her love.

The mother also charges that the trial judge committed procedural errors, in denying her motion to continue the hearing, in considering her as a mere witness instead of as an adversary party, and in failing to appoint a guardian ad litem for the child. The charge is without merit. The matter of continuance is within the discretion of the judge. He did not abuse that discretion. The mother received notice of the return day on June 3, 1955. The return day was June 29. On that day she requested a continuance of sixty days. The request was denied because such continuance would inconvenience the father, who had come from San Francisco for the hearing. The denial did not prejudice the mother in any way because the father was available for cross-examination, and was extensively cross-examined, at a later date. With respect to the status of the mother at the hearing, it made no difference to her whether

she was considered by the judge as a witness or as an adversary party because she was in fact treated as a party and permitted to remain in the courtroom while the father was excluded from the courtroom. There is no error in the failure of the judge to appoint a guardian ad litem. Such appointment is permissive and not mandatory. (R. L. H. 1945, § 12507; R. L. H. 1955, § 338-8) There is nothing in the record that indicates that the child was prejudiced by the absence of a guardian ad litem.

Affirmed.

*Louis Le Baron* (also on the briefs) for appellant.

*E. James McGuire* (*James A. Leavey* with him on the briefs) for petitioners-appellees.