CARLIN CRAIG WOODRUFF and MIKALA KALAULIPO WOODRUFF, on behalf of JANE DOE, a female child, Born on January 19, 1975, Petitioners-Appellants, *v.* JEAN KEALE and JOHN KEALE, Respondents-Appellees

AND

In the Interest of JANE DOE, a female child, Born on January 19, 1975

NO. 7509

FC-M NO. 2438 and FC-TPR NO. 0282

DECEMBER 9, 1981

RICHARDSON, C.J., OGATA, MENOR,
LUM, NAKAMURA, JJ.

## OPINION OF THE COURT BY LUM, J.

This is an appeal from a family court order terminating the parental rights of the appellants, Carlin Craig Woodruff and Mikala Kalaulipo Kanahele Woodruff, in their natural child, Jane Doe. The family court found that appellants had failed to provide for Jane's care and support although able to do so while Jane was on Niihau in the custody of Mrs. Jean Keale and her son John for over one year, pursuant to HRS § 571-61(b)(1)(D). The court additionally found that termination of the Woodruffs' parental rights and granting of custody of Jane to the Keales would be in Jane's best interest. We reverse and remand.

Jane and her twin sister were born on January 19, 1975. Shortly after their birth, both girls were taken to Kauai, where Jane's twin sister was left to be cared for by Mrs. Woodruff's brother and his wife until October, 1978, when she was returned to the Woodruffs upon the Woodruffs' request.

Jane, the subject of this case, returned to Oahu with her natural parents. Between the early part of 1975 and the end of May, 1976, Jane was cared for both by her natural parents and by John Keale and his sisters Luana and Jean. John, Jean and Luana Keale were attending school at the time. Mrs. Jean Keale, mother of the three Keale children, was a second or third cousin of Mikala Woodruff. While the testimony of the parties conflicts sharply as to the amount of time Jane spent with the Keale children, the family court ascertained that the Keales had spent a great deal of time caring for Jane both at their apartment and at the Woodruff's home.

In May of 1976, Mr. and Mrs. Woodruff acceded to the request of Mrs. Kuulei Kelley, grandmother of the three Keale children, that Jane be permitted to return to Niihau with her and Mrs. Keale. While extensive testimony was given regarding the intentions of both the natural parents and the Keales about Jane's going to Niihau, the family court determined that the Woodruffs did not intend the Keales to "hanai" Jane, that is, to treat her as their own child.

Mr. Woodruff left Honolulu in late May, 1976, for Guam, where he remained until September when he returned to Oahu to settle financial affairs and allegedly to arrange for his family's, including Jane's, transportation to Guam. Mrs. Woodruff did not leave for Guam until January, 1977, however, at which time she took only

their eldest daughter Lorraine with her. Mrs. Woodruff had not seen Jane between June of 1976 and her departure for Guam.

Mr. and Mrs. Woodruff returned to Oahu in February, 1977, to collect the twins. Mrs. Woodruff left after several days without making any arrangements to secure Jane's custody. At Mrs. Woodruff's request, Mrs. Keale brought Jane to see Mrs. Woodruff on Kauai and in Honolulu, but Mrs. Woodruff later assented to Jane's return to Niihau. Mrs. Woodruff returned to Guam without the twins and remained there until her second visit to Hawaii in August, 1977, at which time she did not see either Mrs. Keale or Jane.

In June, 1978, Mr. Woodruff was transferred back to Pearl Harbor. On June 13, 1978, the Woodruffs located Jane with the Keales on Kauai and took her, purportedly for the day, agreeing to return her in the evening. The Woodruffs failed to bring Jane back, and, upon the Keales seeking her out, denied them custody of their child. On June 26, 1978, the Keales arrived in Honolulu and, without the Woodruffs' permission, took Jane to Kauai and then back to Niihau. Jane remained on Niihau until October, 1978.

The Keales filed a petition in family court for forfeiture and termination of the Woodruffs' parental rights in July, 1978. The family court found that the Woodruffs had failed to contribute to Jane's support during the entire period that the Keales had custody of Jane, from the end of May, 1976 through June, 1978, although they were financially able to do so. It also evaluated the suitability of each home environment through social workers' reports, evidence of parental behavior and temperament, and the court's own surmisals as to Jane's future on Niihau. Concluding that termination was in Jane's best interest, the court granted legal custody of Jane to Mrs. Keale.

In this appeal, the Woodruffs raise the following issues: (1) Whether the statutory one-year period of non-support must immediately precede the filing of the petition for termination of parental rights; (2) whether the family court erred in ruling that the Woodruffs failed to provide for Jane's care and support for at least one year; (3) whether HRS § 571-61(b)(1)(D) is unconstitutionally vague, in violation of appellants' due process rights under the fourteenth amendment; and (4) whether the Due Process Clause requires the court to make a specific finding of parental unfitness before terminating parental rights.

## I.

Before a court may terminate the rights of natural parents in their children without the parents' consent, it must make two separate findings. First, the court must be satisfied that at least one of the situations enumerated in HRS § 571-61(b)(1) exists.[1] If it so finds, the court must then evaluate the evidence and determine that termination of parental rights would be "necessary for the protection and preservation of the best interests of the child concerned. . . ." HRS § 571-63.

The first three issues focus on the trial court's preliminary finding that appellants, "when the child [was] in the custody of another, [had] failed to provide for care and support of the child when able to do so for a period of at least one year." HRS § 571-61(b)(1)(D). Appellants initially contend that the one-year period must immediately precede and run continuously up to the filing of the petition for termination. They argue that this reading is consistent with the "settled purpose" doctrine, discussed *infra,* under which the natural parent-child relationship may not be severed absent a showing of parental conduct manifesting a "settled purpose" to relinquish all parental rights. According to this reasoning, any voluntary resumption of parental duties and responsibilities prior to the petition's

---

[1] HRS § 571-61(b)(1) (1976 & Supp. 1980) provides as follows:
    (b)  Involuntary termination.
    (1)  The family courts may terminate the parental rights in respect to any child as to any legal parent:
        (A)  Who has deserted the child without affording means of identification for a period of at least ninety days;
        (B)  Who has voluntarily surrendered the care and custody of the child to another for a period of at least two years;
        (C)  Who, when the child is in the custody of another, has failed to communicate with the child when able to do so for a period of at least one year;
        (D)  Who, when the child is in the custody of another, has failed to provide for care and support of the child when able to do so for a period of at least one year;
        (E)  Whose child has been removed from his physical custody pursuant to legally authorized judicial action under section 571-11(2)(A), and who is found to be unable to provide now and in the foreseeable future the care necessary for the well-being of the child;
        (F)  Who is found by the court to be mentally ill or mentally retarded and incapacitated from giving consent to the adoption of or from providing now and in the foreseeable future the care necessary for the well-being of the child.
        (G)  Who is found not to be the child's natural or adoptive father.

filing would destroy the court's basis for terminating the natural parents' rights. Therefore, because appellants had voluntarily regained custody of Jane for several weeks in June, 1978, they argue that the one-year requirement had not been met. We disagree.

It is well established in this jurisdiction that courts are bound to give statutory language its plain and obvious meaning in the absence of ambiguity and where a literal reading of the language would not produce a result that is absurd or inconsistent with the purposes of the statute. *In re Spencer,* 60 Haw. 497, 499, 591 P.2d 611, 613 (1979); *Tangen v. State Ethics Commission,* 57 Haw. 87, 93, 550 P.2d 1275, 1279 (1976); *State v. Park,* 55 Haw. 610, 614, 525 P.2d 586, 589-90 (1974); *Pacific Insurance Co. v. Oregon Automobile Insurance Co.,* 53 Haw. 208, 210-11, 490 P.2d 899, 901 (1971).

We think that the phrase "at least one year" unambiguously indicates the period for which natural parents must fail to provide for the child before their rights may be terminated without their consent. Nothing in the statute, nor in its legislative history, suggests that the term refers solely to the year immediately preceding the petition's filing.

The statute's legislative background in fact suggests that the one-year period requirement should be read without the suggested restriction. Act 205, Session Laws of Hawaii 1970, amended the termination statute so as to make it consistent with the revised adoption laws.[2] In both statutes, the term "abandonment" was eliminated as a ground for judicial action without parental consent.[3]

---

[2] Because termination proceedings are one means used to facilitate adoptions, *see* HRS § 578-2(c)(1)(F) (1976), the legislature recognized a need to conform the termination laws to the parallel provisions in the adoption statute in order to prevent use of the former to avoid compliance with the latter. Act 205, 1970 Haw. Sess. Laws 477-78, § 1. The adoption laws were amended in 1969 to clarify and identify the situations in which parental consent would not be required for adoptions. Act 183, 1969 Haw. Sess. Laws 330; S. Stand. Comm. Rep. No. 243, 5th Haw. Leg., 1st Sess., *reprinted in Senate Journal* 976 (1969); H. Stand. Comm. Rep. No. 710, 5th Haw. Leg., 1st Sess., *reprinted in House Journal* 896 (1969); *see* In re Adoption of Male Child, 56 Haw. 412, 416-17, 539 P.2d 467, 470 (1975).

[3] HRS § 571-61(b) originally allowed the family court to terminate parents' rights without their consent where the minor child had been abandoned for a period of not less than six months. *See* HRS § 571-61(b)(1) (1968). Similarly, HRS § 578-2 (1968), before it was amended in 1969, provided, *inter alia,* that parental consent to adoption was not required where the subject child had been abandoned for a period of six months, or where parental rights had been terminated pursuant to chapter 571.

In its place, legislators spelled out specific factual situations representing the components of abandonment, proof of any of which would conclusively establish that a parent who was guilty of such conduct would not be required to consent.[4] *In re Adoption of Male Child,* 56 Haw. 412, 417, 539 P.2d 467, 470 (1975); H. Stand. Comm. Rep. No. 257, 5th Haw. Leg., 2d Sess., *reprinted in House Journal* 861 (1970); S. Stand. Comm. Rep. No. 961, 5th Haw. Leg., 2d Sess., *reprinted in Senate Journal* 1441 (1970). The revisors' apparent intent was to provide an objective basis for determining when certain parental conduct would amount to abandonment. *Cf.* S. Stand. Comm. Rep. No. 243, 5th Haw. Leg., 1st Sess., *reprinted in Senate Journal* 976 (1969). In view of the legislature's attempt to be specific in its delineation of types of conduct, this court is not at liberty to presume that it intended a qualifying construction of the term in question that is not evinced by the statutory language or the legislative history.

Furthermore, as observed by the family court judge, placing appellants' construction on the statutory language would create the potential for results wholly inconsistent with the purposes of the statute. Act 232, Session Laws of Hawaii 1965 (establishing the family court system), of which the termination statute was a part, contained in its preamble the following statement:

Sec. 333-1. *Construction and purpose of chapter.* This chapter shall be liberally construed to the end that families whose unity or

---

[4] S. Stand. Comm. Rep. No. 243, 5th Haw. Leg., 1st Sess., *reprinted in Senate Journal* 976 (1969) describes the changes made to the adoption laws as follows:

Subsection (b) of Section 331-2 of RLH '55 enumerates the persons as to whom consent and notice are not required and adds the following:
1. a parent who deserts a child without affording means of identification for 90 days; for example, the typical foundling case;
2. a parent who abandons a child either by:
    (a) failing to communicate with the child for at least two years when able to, or;
    (b) failing to provide care and support of the child for at least one year when able to do so.
With respect to item No. 2 above, it should be noted that we have never had an adequate statutory definition of abandonment. As a result, under the present law, reliance has been primarily on case law, which varies widely on the mainland. The aforesaid provisions set forth a specific definition of abandonment framed after considerable work by the American Bar Association as well as the Adoption Committee of the State Commission on Children and Youth.

well-being is threatened shall be assisted and protected, and restored if possible as secure units of law-abiding members. . . . 1965 Haw. Sess. Laws at 360. Clearly this purpose of promoting family unity where possible could be thwarted by a law which might prevent custodial parents from encouraging natural parents to communicate with and support their children, simply in order to preserve their ability to seek termination of the latters' rights. As the family court judge envisioned, such a law may compel custodial parents to file a petition immediately upon the expiration of the statutory period, even though the filing, at such time, may not be necessary or in the child's best interest. Moreover, the legislature specifically dictated above that the family statutes be liberally construed so as to promote, not hinder, familial relationships. Appellants' proposed reading of HRS § 571-61(b)(1)(D) does not comport with this directive.

Our conclusion here is consistent with our decision in *In re Adoption of Male Child, supra.* That case involved an interpretation of the adoption laws which parallel the termination statute in their provisions allowing judicial action without parental consent.[5] The family court had granted a petition for adoption to the natural mother's husband, over the objection of the natural father. It ruled that the father's consent was unnecessary under HRS § 578-2(b)(2) (ren. 578-2(c)(1)(C), 1969) because he had failed to communicate with the subject child for at least two years. While we ultimately reversed the court's decision, we left untouched the court's finding that the statutory two-year period of non-communication had been established, despite the lack of any evidence of a failure of communication for the two-year period immediately preceding the filing of the petition. *See also Pender v. McKee,* 266 Ark. 18; 582 S.W.2d 929 (1979); *In re Adoption of Smith,* 75 Cal. Rptr. 900 (Cal. App. 1969); *In re Adoption of Jane Doe,* 42 Haw. 250 (1957); *Curton v. Gordon,* 510 S.W.2d 682 (Tex. Civ. App. 1974).

Appellants' attempt to invoke the settled purpose doctrine to justify their interpretation has superficial appeal, but little merit. This doctrine, where applicable, focuses on the element of intent as opposed to conduct, and has been used as an additional probative

---

[5] *See supra* note 2.

tool rather than a device for interpreting and qualifying the statutory language itself. *See* discussion *infra; In re Adoption of Male Minor Child*, 50 Haw. 255, 438 P.2d 398 (1968); *In re Adoption of Tom Minors*, 37 Haw. 532 (1947).

## II.

Appellants next contend that the trial court erred in finding that they failed to provide for Jane's care and support, by construing the term "care and support" to refer solely to monetary contribution. They urge this court to more broadly interpret the statutory language so as to encompass more than financial support — for example, those situations in which parents provide for "care and support" by placing their child in the custody of others or otherwise make provision in kind. Additionally, appellants claim that the phrase "care and support" renders HRS § 571-61(b)(1)(D) unconstitutionally vague in its failure to warn parents in specific terms of proscribed conduct. We disagree.

Parental failure to provide for the child's care and support for one year, when able to do so and when the child is in the custody of another, is one of the two factual grounds for involuntary termination that replaced the term "abandonment."[6] The substitute language derived from the Uniform Adoption Act promulgated by the National Conference of Commissioners on Uniform State Laws and the American Bar Association. *See* S. Stand. Comm. Rep. No. 243, *supra*. Neither the Uniform Adoption Act nor the pertinent Hawaii Revised Statutes contains a definition of the phrase "care and support." However, we think that the language, read in the context of the entire statute and consistently with its purposes, *Pacific Insurance Co. v. Oregon Automobile Insurance Co., supra* at 212, 490 P.2d at 902, refers to financial support.

As we previously pointed out, the legislature's intent in deleting the term "abandonment" and replacing it with specific instances of conduct was to clarify and identify those situations in which parental consent could be dispensed with. The substituted definition of "abandonment," as we observed in *In re Adoption of Male Child, supra*, 56 Haw. at 417, 539 P.2d at 470, is very similar to that articulated by

---

[6] *See supra* note 4.

the court prior to the amendment. In *In re Adoption of Male Minor Child, supra,* 50 Haw. at 257, 438 P.2d at 400, we stated:

> What then is abandonment? Without question abandonment is conduct. The typical kinds of conduct are set forth in the first test of *Tom:* the withholding of parental presence, love, care, filial affection, and support and maintenance. In addition, the conduct on the part of the parent must be intentional, conduct which shows a settled purpose to relinquish all parental rights in the child.

In *In re Adoption of Male Minor Child,* we ruled that "failure of communication" in HRS § 571-61(b)(1)(C) embodied the "withholding of parental presence, love, care, [and] filial affection" described above. This definition includes all outward expressions of psychological support and nurturing which appellants urge that "care and support" refer to. Their claim that "care and support" is provided by placing the child in the custody of others moreover ignores the express language of the statute. Involuntary termination may occur only when this failure of communication or of care and support occurs while the child is already in the custody of others. *See* HRS § 571-61(b)(1)(C) and (D).

Giving "care and support" its logical meaning in light of the other statutory language and the legislature's intent to clarify the law, we conclude that "care and support" refers exclusively to financial support.

Additional support comes from the fact that the legislature treated "care" and "support" as synonymous terms. Act 205, Session Laws of Hawaii 1970, amending the termination laws, provides as follows:

> Act 183 of the 1969 Legislative Session eliminated the concept of abandonment from the adoption statute and replaced it with two alternative factual situations, namely, *failure to communicate with a child for a period of two years when able to do so, or failing to support the child for at least one year when able to do so,* as required by law or judicial decree (Sec. 578-2(b)(2)). (Emphasis supplied.)

*See also* Commissioners' Notes, Uniform Adoption Act § 6. The distinction drawn between "communication" and "support" is instructive. The plain meaning of "support," as admitted by appellants, is financial support. *See In re Adoption of Smigaj,* 171 Mont. 537, 560 P.2d 141 (1977); *In re Adoption of Lewis,* 8 Ohio St.2d 25, 222

N.E.2d 628 (1966).

Because appellants do not challenge the family court's finding that they failed to provide financially for Jane's upkeep for approximately eighteen months, we hold that the trial court did not err in finding that they failed to provide for Jane's care and support for that period.

## III.

Accordingly, appellants' claim that HRS § 571-61(b)(1)(D) is unconstitutionally vague must also fail. The void for vagueness doctrine, as traditionally applied to criminal statutes, requires inquiry into the following: (a) Whether the statute provides fair warning of proscribed conduct, *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972); *State v. Kaneakua,* 61 Haw. 136, 597 P.2d 590 (1979); *State v. Manzo,* 58 Haw. 440, 454, 573 P.2d 945, 954 (1977); (b) whether it provides clear guidelines so as to prevent arbitrary application and enforcement, *State v. Kaneakua, supra; State v. Kimball,* 54 Haw. 83, 503 P.2d 176 (1972); *State v. Grahovac,* 52 Haw. 527, 480 P.2d 148 (1971); and (c) whether the statute "overreaches" by lack of clarity so as to prohibit lawful or constitutionally protected, as well as unlawful, activites.[7] *See Grayned v. City of Rockford, supra; State v. Manzo, supra.*

Based on our conclusion above, we find that HRS § 571-61(b)(1)(D) does not deprive parents of their procedural due process rights under the fourteenth amendment. The words "care and support" clearly inform parents that, at the very least, they must provide financially for their child to avoid the risk of involuntary termination. While the legislature in fact may have been more precise in phrasing the statutory language, we note that the statute is

---

[7] In the recent case of Alsager v. District Court of Polk County, Iowa, 406 F.Supp. 10 (S.D. Iowa 1975), *aff'd,* 545 F.2d 1137 (8th Cir. 1976) (per curiam), the federal district court, finding Iowa's termination statute void for vagueness, reframed the third inquiry in terms of protecting fundamental rights from state officials' overreaching. In addition to finding the absence of fair notice and the potential for discriminatory enforcement from the statute, the court determined that natural parents had a constitutional right to family integrity that was threatened by the statute's vague language. For the reasons stated herein, however, we find it unnecessary to adopt the *Alsager* analysis at this time.

sufficiently clear so that "the person of ordinary intelligence [is given] a reasonable opportunity to know what is prohibited so that he may act accordingly." *Grayned v. City of Rockford, supra* at 108. Appellants' own reading of the statute to include financial support attests to this finding. The statute articulates an objective standard that is not subject to arbitrary application, and, subject to the limitation we find below, does not impermissibly encroach upon the constitutional right to family integrity recognized by numerous United States Supreme Court decisions. *See, e.g., Moore v. City of East Cleveland,* 431 U.S. 494 (1977); *Stanley v. Illinois,* 405 U.S. 645 (1972); *Prince v. Massachusetts,* 321 U.S. 158 (1944); Note, *The Right to Family Integrity: A Substantive Due Process Approach to State Removal and Termination Proceedings,* 68 Geo. L. J. 213-23 (1979).

## IV.

We do find, however, that the trial court erroneously refused to consider the circumstances surrounding appellants' failure to send support payments to the Keales. We rule that in addition to finding conduct as described in HRS § 571-61(b)(1)(C) and (D), the court must also find from such behavior a settled purpose to relinquish all parental rights in the child.

Adoption cases decided by this court prior to the 1969 and 1970 amendments defined "abandonment" as conduct which evinced a settled purpose to sever the parent-child relationship. *See In re Adoption of Male Minor Child, supra,* 50 Haw. at 257, 438 P.2d at 400; *In re Adoption of Tom Minors, supra* at 540. This definition of abandonment, requiring some showing of intent, has been embraced by other jurisdictions. *See Adoption of Smith,* 38 Ill. App.3d 217, 347 N.E.2d 292 (1976); *In re Susan W.,* 356 N.Y.S.2d 34, 34 N.Y.2d 76, 312 N.E.2d 171 (1974); *In re Adoption of Christofferson,* 89 S.D. 287, 232 N.W.2d 832 (1975); *Fancher v. Mann,* 432 S.W.2d 63 (Tenn. Ct. App. 1968); *In re Adoption of Voss,* 550 P.2d 481 (Wyo. 1976).

Based on this definition, we ruled in *In re Adoption of Male Minor Child, supra,* that lack of support alone was insufficient to establish abandonment.

> The court stressed the fact that the father failed to send support payments to the child. We believe that too much reliance was placed on this factor. . . . Mrs. Moore testified that she

neither asked for nor expected any support from the appellant. *Non-support is not synonymous with abandonment. . . . And non-support is only one factor in determining whether a parent has abandoned his child.*
50 Haw. at 258, 438 P.2d at 400 (citations omitted, emphasis supplied). Therein we found, from the totality of the father's conduct, sufficient evidence of intent to maintain a parent-child relationship despite the failure of monetary support. *See Fancher v. Mann, supra; In re Adoption of Layton,* 196 So.2d 784 (Fla. App. 1967).

The legislature's reframing of the abandonment terminology in the adoption and termination statutes was done with the apparent intent of combining both intent and conduct, so that from proof of the latter the former is conclusively established. *See In re Adoption of Male Child, supra,* 56 Haw. at 417-18, 539 P.2d at 470; Act 205, Haw. Sess. Laws 1970. However, we find that HRS § 571-61(b)(1)(D) cannot be applied to all custodial situations without also encompassing those cases in which intent to drop all parental rights is absent. We are particularly concerned about the situation in which natural parents, while financially able to support their child, leave their child in an environment where the child is known to be receiving proper care. This may occur where natural and custodial parents voluntarily agree that the latter will provide financially for the child, with no intent on either side of permanently depriving the natural parents of the child's legal custody. Without a separate inquiry into the parents' intent as evinced by such action or from the totality of circumstances, natural parents may inadvertently lose their parental rights in arranging for the full, but temporary care of their child.[8] *See, e.g., In re Adoption of Prangley,* 122 So.2d 423 (Fla. App. 1960); *Chapman v. Chapman,* 607 P.2d 1141 (Nev. 1980); *In re Adoption of Hunt,* 211 Or. 472, 316 P.2d 528 (1957).

In view of the statute's avowed purpose of preserving natural relationships wherever feasible, and especially in view of the constitutional protection afforded the right to family integrity, we can-

---

[8] We are aware that in at least one jurisdiction excuses for parental acts or omissions adversely affecting the parent-child relationship are considered when determining the best interests of the child. *See* Dressler v. Aldridge, 567 S.W.2d 48 (Tex. Civ. App. 1978). However, our holding here is consistent with the weight of case authority within and outside this jurisdiction, in requiring consideration of parental intent when examining their conduct.

not allow a conclusive presumption of intent to arise automatically from conduct which did not import the same. We therefore conclude that involuntary termination of parental rights under HRS § 571-61(b)(1)(C) and (D) may not occur absent a finding of both the conduct described and a settled purpose to abdicate all parental rights as evinced by such conduct and its entire context.

## V.

Finally, we reject appellants' contention that a specific finding of parental unfitness must be made before parental rights may be terminated without offending the Due Process Clause. Appellants take issue with the fact that the family court reached a conclusion as to Jane's best interests without determining that they were unfit as parents.

Appellants' claim rests on an erroneous reading and application of dictum from *Quilloin v. Walcott,* 434 U.S. 246 (1978). In *Quilloin,* the Supreme Court affirmed a trial court's refusal to allow an unwed father authority to veto the adoption of his illegitimate child. Georgia law provided that only the mother's consent was necessary for adoption in such cases, unless the father previously had legitimated the child. Against the father's petition for legitimation, the trial court granted the mother's petition for adoption on the grounds that it was in the child's best interests. The Supreme Court rejected the father's argument that the "best interests" standard denied him substantive due process, noting that the father had not sought the child's custody and that adoption would only give recognition to the family unit already in existence. The Court stated:

> We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest." *Smith v. Organization of Foster Families,* 431 U.S. 816, 862-63 (1977) (Stewart, J., concurring in judgment). . . . Whatever might be required in other situations, we cannot say that in this situation to find anything more than that the adoption, and denial of legitimation, were in the "best interests of the child."

434 U.S. at 255.

Viewed in its proper context, the *Quilloin* dictum clearly does not

mandate a specific finding of parental unfitness *per se*. Rather, in recognition of the constitutional protection afforded the parent-child relationship, the Court was suggesting that parents' rights must be considered — be it in the finding of parental consent, culpability or incapacity — before natural ties may be severed over their objections. In other words, parental rights cannot ordinarily be terminated for the sole reason that it would be in the child's best interest. *See In re Wardle*, 207 N.W.2d 554 (Iowa 1973); *In re Leon RR*, 48 N.Y.2d 117, 397 N.E.2d 374, 378 (1979); *In re Murphy*, 218 Or. 514, 346 P.2d 367 (1959).

Hawaii's statutory scheme facilitating the termination of parental rights initially takes parents' rights and interests into account before turning to the child's. In the case of involuntary termination, it is only after the parents have demonstrated some form of "unfitness" as defined by the legislature in HRS § 571-61(b) that the state intervenes as *parens patriae* and considers the best interests of the child. The statute thus gives proper regard to the rights of parents before allowing termination, consistent with due process principles.

Moreover, parental fitness may certainly be one of the factors taken into account in determining the best avenue of action for the child. As we observed in *In re Mary Doe II*, "the concept of the best interests of the child is one that is without any measuring rod," 52 Haw. 448, 453, 478 P.2d 844, 847 (1970), relying on the wisdom and discretion of the family court. *Id.; accord, Turoff v. Turoff*, 56 Haw. 51, 527 P.2d 1275 (1974). Although we previously refused to set out parameters of the "best interests" standard, *In re Mary Doe II, supra* at 453, 478 P.2d at 847, we note that the court may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the child may reasonably be expected to receive in the future. *See In re Dameron*, 306 N.W.2d 743, 745 (Iowa 1981); *In re Ponx*, 276 N.W.2d 425, 433 (Iowa 1979). Other factors for consideration may include the child's own desires and his emotional and physical needs. *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976); *Dressler v. Aldridge*, 567 S.W.2d 48 (Tex. Civ. App. 1978). The court is given much leeway in its examination of reports concerning the child's care, custody and welfare, *see, e.g., Turoff v. Turoff, supra* at 55, 527 P.2d at 1278, and its conclusion, if supported by the record and not clearly erroneous, must stand on appeal. *In re Mary Doe II, supra* at 454, 478 P.2d at 848.

As a concluding note, we add that because severance of the natural parent-child tie is such a drastic remedy, the burden of proving that such action would be in the child's best interest must rest with those seeking it. We now follow the lead of the Texas Supreme Court in *Re G.M.*, 596 S.W.2d 846 (1980), in suggesting that the "clear and convincing evidence"[9] standard of proof govern such a determination. The United States Supreme Court, in *Addington v. State,* 441 U.S. 418 (1979), explained the function of this standard, falling between the preponderance standard of typical civil cases and the beyond-a-reasonable-doubt standard of criminal cases, as serving "to protect particularly important individual interests in various civil cases." *Id.* at 424. The Supreme Court in *Addington* held the clear and convincing standard applicable to civil involuntary commitment proceedings on the recognition that civil commitment constitutes a significant deprivation of liberty requiring due process protection.

There is no question that the right to the integrity of the family unit is one of constitutional dimensions. The Supreme Court, in *Stanley v. Illinois,* 405 U.S. 645 (1972), recognized that the natural relationship between parents and their children is protected by the Due Process and Equal Protection clauses of the fourteenth amendment, and the ninth amendment. The very act of severing the parent-child relationship is cognizably absolute and irrevocable. As standards of proof function "to indicate the relative importance attached to the ultimate decision" and to allocate the risk of error between litigants accordingly, *Addington v. State, supra* at 423, we concur with the Texas Supreme Court in its conclusion that

> [t]he right to enjoy a natural family unit is no less important than the right to liberty which requires at least a clear and convincing standard of proof to inhibit such liberty through involuntary and indefinite confinement in a mental institution. Termination is a drastic remedy and is of such weight and gravity that due process requires the state to justify termination of the

---

[9] In State v. Addington, 588 S.W.2d 569 (Tex. 1979), the Texas Supreme Court defined "clear and convincing" as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* at 570.

parent-child relationship by proof more substantial than a preponderance of the evidence.

*In re G.M., supra* at 847; *see In re Heidi T.,* 87 Cal. App.3d 864, 151 Cal. Rptr. 263 (1978).

Reversed in part and remanded for further proceedings consistent with this opinion.

*Robert M. Harris (Laureen K. K. Wong* with him on the briefs, Legal Aid Society of Hawaii, of counsel) for petitioners-appellants.

*C. Michael Hare* for respondents-appellees.