**IN THE INTEREST OF JOHN DOE**, Born on March 12, 1981, and **JANE DOE**, Born on April 26, 1983, Minors

NO. 14376

(FC–J NO. 10786, FC–J NO. 10787, FC–TPR NO. 89–0001)

FEBRUARY 4, 1991

BURNS, C.J., HEEN, AND TANAKA, JJ.

## AMENDED OPINION OF THE COURT BY BURNS, C.J.

Petitioner Queen Liliuokalani Children's Center (QLCC) appeals the family court's January 31, 1990 Order Granting in Part and Denying in Part Petitioner's Verified Petition for Forfeiture and Termination of Parental Rights (January 31, 1990 Order). The January 31, 1990 Order granted QLCC's petition with respect to the Father but denied it with respect to the Mother. QLCC filed its Notice of Appeal on February 15, 1990. Father filed his Notice of Cross–Appeal on February 28, 1990. We have appellate jurisdiction over both the appeal and the cross–appeal. We affirm the termination of Father's parental rights and vacate the non–termination of Mother's parental rights.

## FACTS

On April 18, 1989 QLCC filed a petition (Petition) to terminate the parental rights of Father and Mother with respect to their son born on March 12, 1981 (Child I) and their daughter born on April 26, 1983 (Child II). Father and Mother were never married.

With respect to Father, the Petition was based alternatively on Hawaii Revised Statutes (HRS) § 571–61(b)(1)(B), (C), or (E) (1985). With respect to Mother, the Petition was based only on HRS § 571–61(b)(1)(E) (1985). These statutory subsections provide as follows:

> (b) Involuntary termination.
>
> (1) The family courts may terminate the parental rights in respect to any child as to any legal parent:
>
> \* \* \*
>
> (B) Who has voluntarily surrendered the care and custody of the child to another for a period of at least two years;
>
> (C) Who, when the child is in the custody of another, has failed to communicate with the child when able to do so for a period of at least one year;
>
> \* \* \*
>
> (E) Whose child has been removed from the parent's physical custody pursuant to legally authorized judicial action under section 571–11(9), and who is found to be unable to provide now and in the foreseeable future the care necessary for the well–being of the child[.]

The January 31, 1990 Order terminated Father's parental rights but not Mother's.

## I.
## Non–Termination of Mother's Parental Rights

Challenging the non–termination of Mother's parental rights, QLCC asserts four points of error.

First, QLCC challenges the family court's finding that Mother had "never expressed a desire to give up all of her parental rights," by citing the statement in *Woodruff v. Keale*, 64 Haw. 85, 98, 637 P.2d 760, 768 (1981), that "a settled purpose to abdicate all parental rights [may be] evinced by . . . conduct and its entire context." *Woodruff* involved the involuntary termination of parental rights under HRS § 571–61(b)(1)(C) and (D). Termination of Mother's parental rights was sought under HRS § 571–61(b)(1)(E) only. Consequently, QLCC's first point is irrelevant.

With respect to QLCC's other three points of error, Conclusions of Law (COL) 3.d and 4, which are actually findings of ultimate fact, are relevant. They state as follows:

3.d) An adjudication of termination of parental rights is necessary for the protection and preservation of the best interests of the children concerned.

\* \* \*

4. The evidence has not established a level of clear and convincing proof that [Mother] is unable to provide now and in the foreseeable future the care necessary for the well being [sic] of the children.

In its Opening Brief, QLCC states the second issue as follows:

Whether a parent's past inability to provide care and support coupled with an uncertain future of employment and living situation, establishes clear and convincing proof of inability to provide now and in the foreseeable future the care necessary for the well–being of the children?

In our view, QLCC's statement of the issue leaves out an essential element. In COL 4 the family court judge found that the facts in the record, including the above–stated facts, did not clearly and convincingly prove the part of HRS § 571–61(b)(1)(E) requiring that Mother be "found to be unable to provide now and in the foreseeable future the care necessary for the well–being of the

[children]." QLCC asks us to conclude that this finding of ultimate fact was clearly erroneous. Therefore, the question is whether the facts in the record, including the above–stated facts, proved COL 4 as a matter of law. Our answer is no.

QLCC's statement of the third issue is as follows:

Whether the Court's conclusions that the best inter-
ests of the minors would be served by adoption is in con-
tradiction to a conclusion that termination of parental
rights would not be allowed?

In our view, there is no contradiction. A parent's parental rights cannot be terminated under HRS § 571–61(b)(1)(E) unless its requirements have been satisfied. The fact that the best interests of the children would be served by their adoption or that they would receive better care in the custody of foster parents does not satisfy the HRS § 571–61(b)(1)(E) requirement that the parent be found to be unable to provide now and in the foreseeable future the care necessary for the well–being of the children.

QLCC's statement of the fourth issue is as follows:

Whether the trial court erred in ruling that the term
"care necessary for the well–being of the children"
should be· viewed solely from the perspective of the par-
ents.

In essence, QLCC contends that the family court's COL 4, which is a mislabeled finding of ultimate fact, is clearly erroneous because it is not supported by sufficient preliminary findings of fact on the relevant factual issues stated in HRS § 587–25 (Supp. 1989). We agree.

HRS § 587–25 (Supp. 1989) states in relevant part as follows:

**Guidelines for determining whether the child's
family is willing and able to provide the child with a
safe family home.** (a) The following guidelines shall be
fully considered when determining whether the child's

family is willing and able to provide the child with a safe family home:

(1) The age and the physical and mental vulnerability of the child;

(2) The date or dates upon which the child was placed out of the family home and the date or dates of any subsequent change in placement;

(3) The magnitude of the harm suffered by the child;

(4) The frequency of the harm suffered by the child;

(5) Whether the child has been the victim of repeated harm after an initial report and intervention by a social agency;

(6) Whether the child is fearful of living in or returning to the child's family home;

(7) The results of psychiatric/psychological/developmental evaluations of the child, the alleged perpetrator and other appropriate family members who are parties;

(8) Whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's family home;

(9) Whether there is a history of substance abuse by the child's family or others who have access to the child's family home;

(10) Whether the nonperpetrators who reside in the child's family home are willing and able to protect the child;

(11) Whether the perpetrator of the harm to the child is identified;

(12) Whether the perpetrator has admitted and acknowledged the perpetrator's responsibility for the harm;

(13) Whether the perpetrator has apologized to the child for the harm;

(14) The motive of the perpetrator;

(15) Whether the perpetrator has been removed from the child's family home and will not return for any reason without the prior permission of the court;

(16) The willingness and ability of the child's family to seek out, accept, and complete counseling services, and to cooperate with and facilitate close supervision by an appropriate social agency;

(17) The willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(18) Whether the child's family demonstrates adequate parental skills, such as providing the child and other children under their care with:

    (A) Minimally adequate health and nutritional care;

    (B) Stimulation, care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) Guidance and supervision consistent with the child's safety;

    (D) A safe physical home environment; and

    (E) Protection from repeated exposure to violence even though not directed at the child;

(19) Whether the child's family has an understanding of the child's needs and capabilities;

(20) Whether the child's family perceives the child as being "different";

(21) The child's family's psychological attachment to the child;

(22) Whether the child's family problems relating to the safety of the family home are sufficiently resolved;

(23) Whether the obstacles to getting assistance are minimal, such as whether telephone and transportation are available;

(24) Whether a competent person knows the child's family well enough to have sufficient contact and knowledge to recognize both immediate and pending problems;

(25) Whether the competent person in paragraph (24) can and will intervene and help, as well as report, when a problem is recognized;

(26) Whether there is available a social support system consisting of an extended family and friends; and

(27) Whether there are other professionals, agencies, or relatives who have provided evidence that the child's family home is safe.

(b) The court shall consider the likelihood that the current situation presented by the guidelines set forth in subsection (a) will continue in the reasonably foreseeable future and the likelihood that the court will receive timely notice of any change or changes in the family's willingness and ability to provide the child with a safe family home.

Many of the twenty–seven "guidelines" stated in HRS § 587–25 (Supp. 1989) are phrased in terms of a situation involving a "perpetrator." In this context, "perpetrator" means one who causes "harm" to the child. "Harm" is defined in HRS § 587–2 (Supp. 1989) as follows:

Definitions. When used in this chapter, unless the context otherwise requires:

* * *

"Harm" to a child's physical or psychological health or welfare occurs in a case where there exists evidence of injury, including, but not limited to:

(1) Any case where the child exhibits evidence of:
   (A) Substantial or multiple skin bruising or any other internal bleeding,
   (B) Any injury to skin causing substantial bleeding,
   (C) Malnutrition,
   (D) Failure to thrive,
   (E) Burn or burns,
   (F) Poisoning,
   (G) Fracture of any bone,
   (H) Subdural hematoma,
   (I) Soft tissue swelling,
   (J) Extreme pain,
   (K) Extreme mental distress,
   (L) Gross degradation, or
   (M) Death, and

   such injury is not justifiably explained, or where the history given concerning such condition or death is at variance with the degree or type of such condition or death, or circumstances indicate that such condition or death may not be the product of an accidental occurrence; or

(2) Any case where the child has been the victim of sexual contact or conduct, including, but not limited to, rape, sodomy, molestation, sexual fondling, incest, prostitution; obscene or pornographic photographing, filming, or depiction; or other similar forms of sexual exploitation; or

(3) Any case where there exists injury to the psychological capacity of a child as is evidenced by an observable and substantial impairment in the child's ability to function; or

(4) Any case where the child is not provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, or supervision; or

(5) Any case where the child is provided with dangerous, harmful, or detrimental drugs as defined by section 712–1240; however, this paragraph shall not apply to a child's family who provide such drugs to the child pursuant to the direction or prescription of a practitioner, as defined in section 712–1240.

QLCC seeks permission on remand "to present additional evidence . . . ." QLCC had a full opportunity to present all relevant evidence and has not on appeal complained of being denied that opportunity. However, we permit the family court to consider additional evidence if, in its discretion, it decides to do so.

Therefore, we vacate that portion of the family court's January 31, 1990 Order that denied QLCC's petition with respect to Mother. We remand this case to the family court to allow it an opportunity to consider additional evidence, amend and supplement its findings of fact and, in the light thereof, either to affirm or amend its conclusions of law and order with respect to Mother's parental rights.

## II.
## Termination of Father's Parental Rights

In his cross–appeal, Father challenges the termination of his parental rights. The family court did not specify under what statutory subsection(s) it terminated Father's parental rights. QLCC contends that HRS § 571–61(b)(1)(C) and (E) were satisfied. Our decision is that HRS § 571–61(b)(1)(E) was satisfied. Therefore, the questions whether HRS § 571–61(b)(1)(C) and *Woodruff v. Keale*, 64 Haw. 85, 637 P.2d 760 (1981), were satisfied are moot.

The family court's March 27, 1990 Findings of Fact and Conclusions of Law state, in relevant part, as follows:

## FINDINGS OF FACT

\* \* \*

11. Child protective proceedings were filed on April 23, 1985 for [Child I] (FC–J 10786) and [Child II] (FC–J 10787).

12. [On] July 11, 1985 an order establishing jurisdiction and awarding foster custody was entered in the two DHS [Department of Human Services, State of Hawaii] cases. The hearing was held on June 13, 1985 at which time the parties stipulated to the order.

\* \* \*

18. \* \* \* Since April, 1985 the children have never resided with [Mother] or [Father].

19. [The Foster Parents of the children] desire to adopt the children.

20. [Father] has been incarcerated at Oahu Community Correctional Center since the last half of 1988, where he is serving a maximum ten year sentence for armed robbery and felon in possession. He was sentenced to a mandatory minimum of three years but his parole board has not met to set any other minimum.

21. [Father] has had no contact, direct or indirect, with the children since they were placed in foster custody. \* \* \* At one time [Father] attempted to facilitate an adoption of the children by his father and step mother. His major motivation in objecting to these proceedings is to protect the children from loosing [sic] their historically significant lineage. He demonstrates no interest in providing for the day–to–day needs and care of the children.

## CONCLUSIONS OF LAW

\*´ \* \*

3.  There is clear and convincing evidence to support the following conclusions:

a)  The orders filed April 23, 1985 and July 11, 1985, constitute a removal from the parent's physical custody pursuant to HRS 571–11(9), . . . , even though, the children were not physically with [Father] at the time [Mother] voluntarily gave custody of them to DHS.

\* \* \*

c)  [Father] is unable now, and in the foreseeable future, to provide the care necessary for the well being [sic] of the children.

d)  An adjudication of termination of parental rights is necessary for the protection and preservation of the best interests of the children concerned.

e)  An adjudication of termination of parental rights will facilitate an adoption.

\* \* \*

5.  The Court may terminate the parental rights of one parent without terminating the other's. In so doing it facilitates an adoption even if the parent whose rights were not terminated presently refuses to consent, because only the consent of one parent would be necessary for any future adoption.

### A.
### HRS § 571–63

HRS § 571–63 (1985) states in relevant part as follows:

Findings and judgment. No judgment of termination of parental rights . . . shall be valid or binding unless it

contains a finding ... that the adjudication of termination of parental rights is necessary for the protection and preservation of the best interests of the child concerned and will facilitate the legal adoption of the child.

Father contends that the order terminating his parental rights will not facilitate an adoption because Mother refuses to consent to an adoption and her parental rights were not terminated. We disagree. "Facilitate" does not mean guaranteed to happen. "Facilitate" means to make easier, to aid, to assist. The fact that only one consent to adoption must be obtained, rather than two, does make adoption easier.

### B.
### HRS § 571–61(b)(1)(E)

Father contends that the first part of HRS § 571–61(b)(1)(E) was not satisfied because the children were not living with him when the family court awarded their physical custody to foster parents. In his view, HRS § 571–61(b)(1)(E) applies only to parents with whom the children were living when the court acted. We disagree.

HRS § 577–3 (1985) states in relevant part as follows:

Natural guardian; liability for torts of child. The father and mother of an unmarried minor child are jointly the natural guardians of the child's person and property. They shall have equal powers and duties with respect to the child and neither shall have any right superior to that of the other concerning the child's custody or control or any other matter affecting the child[.]

When the family court's orders were entered on April 23, 1985 (Order for Protective Custody and for Temporary Foster Custody) and July 11, 1985 (Order Establishing Jurisdiction and Awarding Foster Custody), Father and Mother jointly had the legal

right to the physical custody of the two children. The facts that Father and Mother were not residing together and that the two children were not residing with Father had no impact on their legal right.

Father also contends that HRS § 571–61(b)(1)(E) was not satisfied because the evidence was insufficient to support the finding that he was unable then and in the foreseeable future to provide the care necessary for the well–being of the children. In light of the record, we disagree.

## CONCLUSION

Accordingly, we affirm the family court's January 31, 1990 Order Granting in Part and Denying in Part Petitioner's Verified Petition for Forfeiture and Termination of Parental Rights insofar as it terminates Father's parental rights and vacate it insofar as it does not terminate Mother's parental rights. We remand for further action consistent with this Amended Opinion.

*Clayton C. Ikei* and *Carol Grell*, on the briefs, for petitioner–appellant, cross–appellee Queen Liliuokalani Children's Center.

*John J. Baker*, on the brief, for respondent–appellee, cross–appellant Father of Doe Minors.

*Bonnie E. McFadden*, on the briefs, for respondent–appellee Mother of Doe Minors.