IN THE INTEREST OF F. CHILDREN (FCS NO. 05-10254).
IN THE INTEREST OF F. CHILDREN (FCS NO. 00-06581).
IN THE INTEREST OF L. CHILDREN (FCS NO. 05-10333).
Nos. 28882, 28883, 28884
Intermediate Court of Appeals of Hawaii.
May 8, 2009.
On the briefs:
Naomi Hirayasu, for Appellant/Cross-Appellee Father.
Tae W. Kim, for Appellee/Cross-Appellant Mother.
Patrick A. Pascual, Deputy Attorney General, for Petitioner-Appellee/Cross-Appellee, Department of Human Services.

MEMORANDUM OPINION
RECKTENWALD, C.J., FUJISE and LEONARD, JJ.
In consolidated appeals, Nos. 28882 (FC-S 05-10254), 28883 (FC-S 00-06581), and 28884 (FC-S 05-10333), Appellant/Cross-Appellee Father (Father) and Appellee/Cross-Appellant Mother (Mother) appeal the Order Awarding Permanent Custody and Letter of Permanent Custody (Order), filed on November 7, 2007, in the Family Court of the First Circuit (family court) in each of the above cases.[1]

I. BACKGROUND[2]
The three actions involve seven siblings (LF-1, JF-1, JF-2, LF-2, LF Jr., LL, and JL), who were ages 2 to 9 at the time of trial in November 2007, and an eighth sibling, LF-4, who was 17 months old at the time of trial and was the subject of another case, FC-S No. 06-10934.[3] The children also have an older half sibling, KF[4], who was 16 at the time of trial.
The instant proceedings were the second family intervention by the Department of Human Services (DHS). The first occurred in March 2000, when DHS confirmed physical abuse of KF by Mother and Father. KF had extensive visible injuries on his back, leg, face, hand and buttocks after being struck by Mother and Father. KF, LF-1 and JF-1 were placed in foster care, but later returned to the family home and DHS assumed family supervision. Mother and Father completed services, including two parenting education programs and a domestic violence program, and Father also completed an anger management program. The family court terminated its jurisdiction over the underlying cases in 2003.
The family again came to the attention of DHS in January 2005. JF-2, a girl who was age 4 at the time, was observed at her preschool with injuries to her right arm, left arm and left leg, and reported that Father had hit her with a hanger. Although Mother denied that Father had caused the injuries and instead blamed her son LF-1, JF-2 made consistent statements both at her preschool and during a medical examination attributing the injuries to Father. DHS removed JF-2 from the family home for several days, and then returned her on the condition that Mother supervise all contacts between Father and LF-1, JF-1, JF-2, LF-2, LF Jr.
DHS filed Petitions for Family Supervision in FC-S No. 00-06581 and FC-S No. 05-10254 on March 22, 2005. Mother was duly served and accepted service on behalf of Father, although there were questions about the validity of service on Father. Mother and Father failed to appear for the scheduled hearing on the Petitions on April 4, 2005, and the family court awarded family supervision to DHS.
On that same day, DHS conducted an unannounced home visit, and discovered Father alone with the five children in violation of DHS's prior direction to Mother. Father told the DHS social worker that he was Mother's brother "John."[5] DHS subsequently assumed foster custody of the five children.
A Family Service Plan dated April 7, 2005 required both parents to undergo random urinalysis testing and complete a home-based parenting program, Father to complete anger management classes, and both parents to complete a psychological evaluation and to follow the evaluator's subsequent recommendations.
On April 21, 2005, Mother gave birth to twins LL and JL, and DHS assumed temporary foster custody before their scheduled release from the hospital on April 28, 2005. DHS filed a Petition for Temporary Foster Custody of LL and JL on May 3, 2005 in FC-S No. 05-10333.[6] The family court consolidated the three pending cases for trial, and on May 24, 2005, Mother and Father stipulated to adjudication and disposition (foster custody and the service plan) in all three cases.
On July 5, 2005, the family court entered an Order of Protection in FC-DA No. 05-1-1449, which prohibited Father from having contact with Mother. The Order of Protection expired on July 20, 2006. On June 7, 2006, Mother gave birth to LF-4, eleven months after the Order of Protection was entered. DHS assumed temporary foster custody and filed a Petition for Temporary Foster Custody in FC-S No. 06-10934. Mother and Father contested the Petition and the matter was set for adjudication, although the court confirmed DHS's temporary assumption of custody.
On August 10, 2006, DHS filed its Motion for Order Awarding Permanent Custody and Establishing a Permanent Plan in the three cases involving the seven children. Mother and Father failed to appear at a consolidated pretrial hearing on September 21, 2006, and the family court entered a default against both Mother and Father, entered orders terminating Mother and Father's parental rights, and ordered the proposed permanent plan. However, on October 3, 2006, the court granted Mother and Father's motion to set aside default.
During the course of these proceedings, DHS learned of additional incidents involving the striking of the children by Mother and Father. LF-1 disclosed that he was subjected to inappropriate physical discipline by both Mother and Father, such as being hit with objects like an umbrella, wire and hangers or through the excessive use of physical force.[7] JF-1 was also assessed to have suffered physical harm by Father.[8]
Additionally, in July 2005, DHS confirmed a report that JF-1 was subjected to sexual harm by her half-brother KF and by her maternal uncle.[9] Mother later testified on behalf of the defense during a criminal trial of the maternal uncle for the sexual abuse of JF-1,[10] and the maternal uncle was found not guilty of the criminal charge.
According to an October 17, 2005 Safe Family Home Report, at an October 12, 2005 Ohana Conference, the social worker present recommended additional services for Mother including sex abuse counseling to help her support JF-1 provided by the Catholic Charities Sexual Abuse Treatment Program (CSATP), and domestic violence/anger management classes, and Mother agreed to follow the recommendations. According to the October 17, 2005 Family Service Plan, the sexual abuse counseling was to include individual counseling for both parents as well as conjoint parent-daughter sessions "when deemed appropriate by their individual therapists."
According to a February 16, 2006 Safe Family Home Report, Mother and JF-1 were currently participating in individual therapy sessions with CSATP therapists. At some point during therapy Mother revealed that she had also been molested as a child, and a CSATP therapist reported that Mother exhibited "a lot of AMAC (Adult Molested as Child) issues and that she needs to complete her AMAC treatment." The therapist indicated that if Mother "learns to heal her own wounds, then she will listen, internalize, and be able to implement what she has learned." The therapist also recommended that Mother complete another parenting class and anger management class once she finished with AMAC treatment. The Safe Family Home Report stated that DHS was "concerned that [Father] is essentially at the same point that he was [at] back in October 2005, which is barely compliant with his services and demonstrating no progress." Although DHS assessed that Mother "seems to be making progress, she needs to demonstrate behavioral changes. [Her] therapeutic needs will require long-term treatment and both parents have not been honest regarding the status of their relationship."
Trial in the instant matters was originally scheduled for June 20, 2007, but was continued when it was disclosed to the court that there were concerns regarding the foster home in which the five older children had been placed.[11] The five children were apparently placed in an "emergency shelter home," and in August 2007, with the approval of the family court and the agreement of Father, Mother, and Robert Brede of the Volunteer Guardian Ad Litem (VGAL) Program, were sent to Washington state for a "summer visit" with their paternal uncle and his spouse, pending formal approval of the placement of the children there pursuant to the Interstate Compact on Placement of Children, Hawaii Revised Statutes (HRS) Chapter 350E (ICPC). The five children remained at that home at the time of trial.
In June 2007, the foster parents of the two youngest children (LL and JL) and their younger sibling LF-4, filed a motion seeking approval of the court to relocate the three children outside of Hawai`i in December 2007. The motion indicated that all three children had been placed with the same foster family since they left the hospital after birth, although they had regular supervised visits with Mother and Father, that the foster family was relocating to Germany in December 2007 due to the foster father's military service and needed advance approval to be able to plan for the three children to accompany them, that the foster family wanted to adopt the three children should Mother and Father's parental rights be terminated, and that the foster family would abide by any future ruling of the court requiring them to return the three children to Hawai`i. On October 22, 2007, the family court granted the motion, over the opposition of Mother, Father, DHS and the VGAL.[12]
Trial was held on November 6 and 7, 2007. Dina Koyanagi (Koyanagi), Unit Supervisor for DHS, and Laura Bailey-Sato (Sato), the DHS social worker assigned to this case, testified on behalf of the State. Both were qualified by the court as experts in the field of social work and child protection and welfare services. Mindie Ching (Ching), a therapist with CSATP, also testified for the State, and was qualified by the court as an expert in the field of inter-familial sexual abuse. Brede, VGAL Program Manager and case manager of this case since June 2007, testified on behalf of the VGAL Program, and was qualified by the court as an expert in the area of social work. Mother and Father also testified. At the end of trial, the court orally ruled that it was terminating Mother and Father's parental rights and approving the permanent plan. The court entered the Orders on November 7, 2007, and the Findings of Fact/Conclusions of Law (FsOF/CsOL) on January 18, 2008. These appeals followed.

II. POINTS ON APPEAL
Mother raises the following points of error on appeal:
(1) The family court abused its discretion in awarding DHS permanent custody of the seven oldest children and foster custody of the youngest child. The State did not present clear and convincing evidence that Mother was unwilling and unable to provide a safe home for the children.
(2) The family court abused its discretion in granting the foster parents' motion to relocate the three youngest children outside the State of Hawai`i.
(3) The State did not present "clear and convincing evidence . . . that the proposed permanent plan assisted in meeting the goal of adoption[.]" Mother argues that the Permanent Plan was not in the best interests of the children because she has "been trying hard to reunify with the children[,]" the "visits were reportedly going well[,]" and DHS testimony in support of terminating her parental rights was "vague and fluid[.]"
(4) Mother also challenges FsOF 136-37, 140, 143-45, 152-60, 183-85, 188-94, and CsOL 8-10 and 12.
Father raises the following points of error on appeal:
(1) "It was error to file over 200 [FsOF and CsOL] that exceed[ed] 50 pgs when those findings were repetitive, incorrect, and in some cases had no support in the trial record."
(2) "It was wrong and a denial of due process and further resulted in no substantial evidence of `AMAC' when DHS failed to call Dr. Tom Loomis, the only qualified clinical psychologist who worked with or examined mother, to testify as to any diagnosis of `AMAC' for mother."
(3) "It was wrong to admit VGAL Linda Carlson's reports as written Exhibits when these reports were not admissible subject to any statutory hearsay exception, and when their admission also violated parents' rights to substantive and procedural due process because parents had no opportunity to cross-examine her in light of the extreme bias against mother displayed by the VGAL throughout the proceedings."
(4) "DHS's failure to present parents' counsel with more than 450 Exhibits in compiled form at any time before or after trial was wrong, and deprived of effective notice and effective ability to cross examine, in violation of their rights to due process."
(5) "It was wrong to consolidate jurisdictional and permanency trials because the issues to be decided and the burden of proof differed."
(6) "It was wrong to fail to give mother unsupervised visitation, overnight visitation, or to return children to mother under foster supervision in the hearings of December 20[,] 2005 and February 7, 2007."
(7) "It constituted a denial of due process rights of the parents and contravened the best interest of the children of the parties for DHS and the VGAL to fail to disclose criminal record of the foster father of the 5 older [] children to the court for over a year after DHS became aware of it, for keeping children with fosters [sic] for a year after foster father had pleaded to two counts of sex abuse and had been granted a Deferred Acceptance of Guilty Plea."
(8) "It was wrong for the Court to allow hearsay testimony by the social worker in a final termination of parental rights hearing. The statute cited to by counsel for the VGAL allows hearsay only in a preliminary temporary foster custody hearing. For all the children except for [LF-4], the issue at trial was permanency, i.e.[,] the termination of parental rights. The cited statute does not allow hearsay in a termination of parental rights hearing."
(9) "The trial court abused it discretion in failing to order guardianship when the DAG represented that guardianship was the goal."
(10) "It was wrong to allow the foster parents to relocate to Germany with the three younger children in derogation of parents' visitation rights and denial of opportunity for the three younger children to bond with parents and with the older five children."
(11) Father specifically challenges FsOF 9-13, 28, 33-37, 55, 58-59, 80, 82, 85, 90, 92, 94-96, 102, 109, 113-118, 121-125, 127-30, 134, 136-47, 150, 152-54, 156-57, 159-60, 163-66, 169, 171, 176, 180-82, 184-86, 188-89, and 190-92, and CsOL 2, 5, 6, and 8-12.
(12) "DHS failed to make reasonable efforts to reunify children with parents, and to place children with relatives who stood ready, willing and able to take the children. Instead, father's brother was told he was not needed because the children would be reunifying with parents soon."
(13) "[T]here is simply no substantial evidence that he and Mother are unable to provide all their children with a safe family home, with or without a service plan."

III. STANDARDS OF REVIEW

A. Family Court Decisions  Abuse of Discretion
When reviewing family court decisions for an abuse of discretion, the appellate courts of Hawai`i have held:
The family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.
In the Interest of Doe, 77 Hawai`i 109, 115, 883 P.2d 30, 36 (1994) (internal quotation marks, citations, brackets, and ellipsis omitted).

B. Findings of Fact and Conclusions of Law
In this jurisdiction, a trial court's [FsoF] are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed.
Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawai`i, 106 Hawai`i 416, 430, 106 P.3d 339, 353 (2005) (internal quotation marks, citations, and ellipses omitted) (quoting Allstate Ins. Co. v. Ponce, 105 Hawai`i 445, 453, 99 P.3d 96, 104 (2004)).
"An FOF is also clearly erroneous when `the record lacks substantial evidence to support the finding.' We have defined `substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Leslie v. Estate of Tavares, 91 Hawai`i 394, 399, 984 P.2d 1220, 1225 (1999) (citations omitted) (quoting State v. Kotis, 91 Hawai`i 319, 328, 984 P.2d 78, 87 (1999)).
A COL is not binding upon an appellate court and is freely reviewable for its correctness. This court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.
Chun, 106 Hawai`i at 430, 106 P.3d at 353 (internal quotation marks, citations, and brackets omitted) (quoting Ponce, 105 Hawai`i at 453, 99 P.3d at 104).

C. Family Court Decisions to Terminate Parental Rights
According to the Hawai`i Supreme Court, "the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal." In re Doe, 101 Hawai`i 220, 227, 65 P.3d 167, 174 (2003) (internal quotation marks, citation, and brackets omitted).

IV. DISCUSSION
We resolve Mother's and Father's points of error in three parts as follows: Mother's and Father's preliminary arguments, which largely deal with procedural and evidentiary rulings of the court, Mother's and Father's specific challenges to the FsOF and CsOL, not including those addressing the ultimate outcome of the case, and whether the family court clearly erred in terminating the parents' rights to the seven children and awarding DHS permanent custody.[13]

A. Procedural and Evidentiary Rulings
Father first argues that the FsOF and CsOL are not in compliance with Hawai`i Family Court Rules (HFCR) Rule 52 because they are "redundant," "duplicative," and "contradictory." However, there is nothing in HFCR Rule 52, HRS § 571-63 (2006 Repl.), or the case law cited by Father which prohibits extensive findings. Although Father cites to Upchurch v. State, that case requires a court's findings to "include as much of the subsidiary facts as are necessary to disclose to this court the steps by which the trial judge reached his ultimate conclusion on each factual issue." 51 Haw. 150, 155, 454 P.2d 112, 116 (1969) (citations omitted). Since the family court here was required to consider the welfare of seven children and DHS's involvement with the family over a seven-year period, the court's FsOF and CsOL are not erroneous based on their length or detail.
Father next argues that it was a denial of due process for DHS not to call Dr. Tom Loomis and VGAL Linda Carlson to testify, and to allow DHS social workers to testify regarding reports identifying Mother as exhibiting AMAC issues, when such reports constituted hearsay.
HRS § 587-73(a) requires that at a permanent plan hearing, a court "shall consider fully all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587-25, including but not limited to the report or reports submitted pursuant to section 587-40[.]" HRS § 587-40 requires DHS to submit timely reports to the court and parties which include "[a]ny report, or medical or mental health consultation, generated by a child protective services multidisciplinary team or consultant[,]" and states that any such written report is admissible and may be relied upon to the extent of its probative value "provided that the person or persons who prepared the report may be subject to direct and cross-examination[.]" HRS § 587-40(c)(1) and (d).
At trial, the family court informed counsel for both parents that it would compel the testimony of a report writer if the party made an offer of proof regarding the subject of cross-examination. There is nothing in the record to indicate that Father made any offer of proof or raised any specific challenges to the testimony of Dr. Loomis, Carlson, or DHS employees not already called to testify, and accordingly this point is deemed waived.
In any event, the fact that the court did not compel the testimony of Dr. Loomis and Carlson did not prejudice Father. Carlson was no longer the VGAL. Brede testified that he took over "the entire management of" the cases as the VGAL in June 2007. He appears to have based his testimony on the six visits he had with the children and his own review of the case. There is no indication that the family court relied on Carlson's reports in its FsOF or CsOL. Also, Father was not prejudiced by the failure to call Dr. Loomis, because his report was not inconsistent with the testimony of the social workers who claimed that Mother needed counseling for AMAC issues. During her June 2005 evaluation with Dr. Loomis, Mother denied that any physical or sexual abuse occurred in her family while she was growing up, and accordingly, Dr. Loomis did not have the predicate information necessary to identify any AMAC issues.
Father next argues that his rights were violated because he did not timely receive exhibit lists or all of the exhibits in advance of trial. However, the record indicates that the vast majority of the exhibits were provided in advance of trial. Moreover, the family court ruled that it would consider requests for additional time to review any documents that were a "surprise." There is nothing in the record to indicate that Father requested additional time to review any documents at any time during the contested hearing, and accordingly, this argument is without merit.
Father next argues that the jurisdictional trial hearing for LF-4 and permanent plan trial for the other seven children should not have been consolidated "because the issues to be decided and the burden of proof differed." However, this argument is without merit. The proceedings were not consolidated but rather held concurrently because the evidence in all four cases would be substantially similar. Moreover, Father does not argue that the family court applied the improper standard of proof to any of these cases.
Father next argues that it was wrong to fail to give Mother unsupervised visitation, overnight visitation, or to return the children to Mother under foster supervision in the hearings of December 30, 2005 and February 7, 2007. However, Father lacks standing to raise this issue on behalf of Mother. See In re D.S., 156 Cal. App. 4th 671, 673-74, 67 Cal. Rptr. 3d 450, 451 (2007). In any event, we conclude that the family court did not abuse its discretion by denying Mother's motions.
Father next argues that he was denied his right to due process because DHS and the VGAL Program failed to properly disclose that the foster father of the oldest five children had been arrested twice for Sexual Assault in the Fourth Degree and had been granted a Deferred Acceptance of Guilty Plea. Upon learning of the failure of DHS and the VGAL Program to disclose the matter, the family court set a hearing to determine what had occurred, and to determine what further steps needed to be taken.[14] The court stated that the parents could file motions to disqualify the VGAL Program and/or DHS, but neither parent did so. We conclude that the family court's handling of this matter was appropriate, and that Father waived any argument to the contrary by not filing a motion to disqualify.
Father next argues that the trial court "abused its discretion in failing to order guardianship when the DAG represented that guardianship was the goal." The original goal of the Permanent Plan of the oldest five children was adoption. After it was discovered that the foster father had been arrested for sexual abuse, DHS represented that it would pursue guardianship rather than adoption "subject to the ICPC approval of Uncle and/or Auntie in the State of Washington." However, at trial, Koyanagi testified that although DHS had pursued guardianship as a possibility, things were "up in the air regarding the ICPC" and "adoption would provide them with the most permanent home" in any event. We conclude that DHS made a good faith effort to evaluate the possibility of guardianship. Moreover, to the extent that Father challenges the court's ultimate determination in favor of adoption, we address his argument below.
Father and Mother both challenge the family court's decision to allow the foster parents to relocate to Germany with the three younger children. However, as discussed above, the Permanent Plan hearing was held in November 2007, prior to the foster family's scheduled departure from Hawai`i, and the foster family had committed to returning the children to Hawai`i if they were not granted custody of them. The family court did not abuse its discretion in providing the foster family with advance approval for the move in October 2007.

B. Challenged FsOF/CsOL
We address the parents' specific challenges to the FsOF/CsOL, excluding those addressing the court's ultimate decision to award DHS permanent custody of the seven children, which we address below.
Father first challenges FsOF 9-13, which discuss Mother and Father's March 2000 physical abuse of KF, the subsequent DHS family intervention, and the parents' conviction for assault. Father argues that these findings are clearly erroneous because the court ruled that it would not consider those issues as evidence in this case. However, although the family court sustained an objection to a question about criminal proceedings against the parents, and also said it would not admit evidence about "specific allegations," it went on to say it would consider the circumstances of the previous intervention to show "the total development of the family" and "a pattern of behavior." While the court's ruling is somewhat unclear, nevertheless, we conclude that evidence of the prior intervention was admissible. See HRS § 587-25(a)(4)(D) (in determining whether a child's family is willing and able to provide a safe family home, the court shall consider historical facts relating to the family, including "[p]rior involvement in services"). Thus, the family court did not err by discussing the prior intervention in its FsOF. While the reference to the conviction in FOF 12 is clearly erroneous, it is harmless error because the court did not appear to rely on the conviction itself in its ultimate decision.
Father challenges FsOF 55 and 58, which state that the foster parents of the three youngest children filed a motion to relocate the children to California, and that the family court granted that motion. Father is correct in pointing out that the foster parents filed, and the court granted, their request to relocate the children to Germany rather than California. However, any error is harmless because it was not material to the court's ultimate disposition.
Father challenges FOF 80 which states that LF-1 had behavioral and emotional problems "resulting from the conditions (harms) he was subjected to" prior to removal from his parents' home. Father argues that the finding is erroneous because LF-1's behavior and emotional issues were due to his removal from the family home and placement into foster care. We agree that the finding is not supported by the record and is therefore clearly erroneous.[15] However, the error is harmless because the family court did not appear to have placed significant reliance on it.
Father next challenges FsOF 85, 96, and 102, which state that after being placed in custody, LF-1, JF-1, and JF-2 had behavioral problems and academic difficulties, that the Department of Education referred them to intervention services, and they had shown steady improvement since then. Father argues that these FsOF are clearly erroneous for the same reasons that FOF 80 was erroneous. However, these findings are supported by the record, and unlike FOF 80, they do not attribute the children's behavioral or academic difficulties to any actions of Mother or Father.
Father next challenges FOF 90 which states that "[d]uring the pendency of these three instant cases, [JF-1] was assessed to have suffered physical harm by Father, and emotional harm while in the care of Mother and Father due to her witnessing the physical abuse of her siblings by Mother and Father, in addition to the harms perpetrated by Mother and Father, as stated herein." Father also challenges FOF 166, which states in part that "Father's use of physical discipline that led to the present (second) DHS and family court intervention was inappropriate and excessive." Father claims there is no evidence in the record to support these findings.
However, as discussed above, the incident causing DHS to intervene for a second time involved Father hitting JF-2 with a hanger which left "curvilinear scar[s]" on her arm and leg. In addition, according to a psychological evaluation done in June 2006, LF-1 stated that his parents were "continuously fighting" with each other. LF-1 recalled one incident in which Father hit Mother with a chair and kicked her out of the house. He also stated that he saw Father throw a brick at his older brother, and that this was "frightening" for him. LF-1 reported that at one time Father grabbed his leg, held him upside down, and kicked his head. Father had also seized him by his hair and slammed his face on the ground, causing his face to bleed. One of his parents hit him with an umbrella, also causing him to bleed. LF-1 also stated that Mother has hit him with a wire, a hanger, a chair, a metal pipe, and wood, that she has thrown spoons at him, and that she also has pulled his hair, punched him, and pinched him.
According to a psychological evaluation in June 2006, JF-1 reported that on one occasion while Father was cooking, Mother yelled at him and Father threw a pot, which hit LF-1. She also stated that Father has hit her with a hanger, a belt, a slipper and shoes. She described these as "frightening" situations. Mother heard testimony regarding LF-1 and JF-1's accounts at trial, and agreed that they were true. Accordingly, there was sufficient evidence in the record that JF-1 suffered physical and emotional harm, and that Father had engaged in excessive and inappropriate discipline of the children.
Father next argues that FsOF 109, 113-18, and 121-25 are clearly erroneous. These findings discuss the medical and developmental issues faced by LF Jr., LL, and JL. The findings were supported by records admitted into evidence, which may be considered by the court pursuant to HRS § 587-25(a)(1)(B), (D) and (G). Even assuming arguendo that they were not relevant, the family court is presumed to base its decision only on relevant evidence, and Father offers no argument on how their inclusion prejudiced him.
Father next challenges FsOF 127-30, which state, inter alia, that parents "must develop insight into their respective problems (safety issues) and the cause of their problems that negatively impacted their ability to provide a safe home[,]" in order to "make sincere and appropriate internal lifestyle changes that would allow them to provide a safe family home[,]" and that "it is reasonable to look at a parent's history and patterns of behavior in assessing a parent's ability to provide a safe family home." These findings were supported by the testimony of Koyanagi, who was qualified as an expert in the field of social work and child protection and welfare services. Father did not object to her testimony at trial. See HRS § 587-25(a)(11) (requiring a court to consider in determining whether a family can provide a safe family home "[w]hether the child's family has demonstrated an understanding and utilization of the recommended/court ordered services designated to effectuate a safe home for the child") (emphasis added); HRS § 587-25(a)(4)(D) and (6) (requiring a court to consider historical facts related to the family, including "[p]rior involvement in services" and whether "there is a history of abusive or assaultive conduct by the child's family"); Woodruff v. Keale, 64 Haw. 85, 99, 637 P.2d 760, 769 (1981) (A "court may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the child may reasonably be expected to receive in the future.") (citations omitted). Accordingly, these findings are not erroneous.
Father challenges FOF 144, which states that Mother's participation in services was "inconsistent throughout the pendency" of these three cases. Father argues that Mother "dutifully completed all services except for the later imposed and never agreed to [the] requirement of `AMAC' therapy." Although there was no evidence that Mother's participation in other aspects of the Service Plan was inconsistent, Mother was referred to CSATP to address both her own victimization as well as to be supportive and protective of JF-1, she agreed to the service, and her treatment was terminated three times for lack of compliance. Thus, this finding is not clearly erroneous.[16]
Father next challenges FOF 192, which states that "[n]one of the underlying facts and data upon which DHS based its opinions, assessments and recommendations was shown to be untrustworthy." Father suggests that Dr. Loomis's report contradicted the testimony of the social workers regarding AMAC and insight. However, as we discussed above, Dr. Loomis's report was consistent with the social workers' testimony.
Father also challenges FsOF 134, 136, 138, 139, 142, 163, 164, 171, and 176, but these points of error are deemed waived because he offers no supporting argument. Hawai`i Rules of Appellate Procedure (HRAP) Rule 28(b)(7). Father also challenges FsOF 28, 33-37, 82, 92, 94, 141, 146, 147, 150, 153, 156, 165, 166, 186 and 187, but these findings are supported by the record, and are not erroneous. CsOL 2 and 8 are correct and supported by the record, and CsOL 5 and 6 are accurate statements of the law. Father's challenges to FsOF 59, 95, 137, 140, 152, 169, and 184 were resolved in our discussion of Father's preliminary arguments, and are not erroneous. Lastly, Father's challenges to FsOF 143, 145, 154, 157, 159, 160, 180, 181, 182, 185, 188, 189, 190, 191 and CsOL 9-12 are challenges to the ultimate outcome of the case, and we address them in the following section.
Although Mother specifically challenges numerous FsOF and CsOL, her points may be deemed waived because she provided no supporting argument. HRAP Rule 28(b)(7). In any event, most of her points overlap with Father's points and have been addressed in our discussion of Father's challenges. Mother's challenges to FsOF 193 and 194 are challenges to the family court's determination of credibility and are not clearly erroneous. Mother's challenges to FsOF 155, 158, and 183 are challenges to the ultimate outcome of the case, and we address them in the following section.

C. Termination of Parents' Rights and Award of Permanent Custody to DHS
We conclude that the family court did not clearly err in concluding that Mother and Father were not presently willing and able to provide the seven children with a safe family home, even with the assistance of a service plan, and that it was not reasonably foreseeable that they would become willing and able to do so within a reasonable period of time. In re Doe, 101 Hawai`i at 227, 65 P.3d at 174. These cases involved multiple instances of significant physical abuse. Father hit JF-2 with a hanger which left visible marks. Moreover, the two oldest children reported that both Mother and Father had imposed physical discipline involving the use of objects including a chair, a metal pipe, a brick and umbrellas, as well as pulling the children's hair, punching, pinching, kicking, and slamming one child's face to the ground. Several of these instances caused bleeding.
This was DHS's second family intervention for the parents' use of excessive and inappropriate physical discipline, despite parents' apparently successful completion of an earlier series of services. See HRS § 587-25(a)(4)(D) and (6) (requiring a court assessing whether a family can provide a safe home the historical facts related to the family, including "[p]rior involvement in services" and whether "there is a history of abusive or assaultive conduct by the child's family"); Woodruff, 64 Haw. at 99, 637 P.2d at 769 (A "court may look to the past and present conditions of the home and natural parents so as to gain insights into the quality of care the child may reasonably be expected to receive in the future.") (citations omitted).
Despite Mother's participation in additional services during the second intervention, Mother failed to develop insight into these issues. For example, Sato testified that Mother was still at risk for resorting to excessive and inappropriate physical discipline because she had not incorporated the lessons of parenting class into her thinking. See HRS § 587-25(a)(11) (requiring a court assessing whether a family can provide a safe home to consider "[w]hether the child's family has demonstrated an understanding and utilization of the recommended/court ordered services designated to effectuate a safe home for the child"). Moreover, Mother was referred to CSATP to address both her own victimization as well as to be supportive and protective of JF-1, and CSATP terminated her treatment three times for lack of compliance. Mother's failure to complete services with CSATP affected her ability to be sympathetic, empathetic, and protective of the children.
Additionally, Father misrepresented his identity to a DHS social worker, apparently so that Mother would not be found in violation of a DHS directive to Mother to supervise the children's interactions with Father. See In re Doe, 95 Hawai`i 183, 197, 20 P.3d 616, 630 (2001) (considering Mother's dishonesty with her service providers about whom she permitted to have access to her daughter in determining whether the family court's award of permanent custody to DHS was clearly erroneous). Mother and Father both failed to comply with an Order of Protection prohibiting Father from having contact with Mother and requiring Mother to report all violations of this order. See HRS § 587-25(a)(9) (in determining whether a family can provide a safe home, the court shall consider "[w]hether the non-perpetrator(s) who resides in the family home has demonstrated the ability to protect the child from further harm and to insure that any current protective orders are enforced"). LF-1 observed incidents of domestic violence between Mother and Father which frightened him. See HRS § 587-25(a)(4)(C) (in assessing whether a family can provide a safe home, a court must consider historical facts of the family including "[m]arital/relationship history"). Father worked long hours and thus would be unable to protect the children from the risk posed to them by Mother when he was not present. Moreover, Sato testified that even if Father increased his presence at home and support for Mother in her caretaking capacity, it would not diminish the children's potential exposure to inappropriate physical discipline.
Accordingly, the family court's decision to award DHS permanent custody of the seven children was not clearly erroneous.
We also conclude that the Permanent Plan recommending adoption was in the best interests of the children. Koyanagi testified that adoption was in the best interests of the seven children. "[T]he testimony of a single witness, if found by the trier of fact to have been credible, will suffice." In re Doe, 95 Hawai`i at 196, 20 P.3d at 629 (citations omitted). That DHS determination is supported by the record which indicates that the seven children had made steady behavioral, academic, medical and developmental improvements since their placement in foster care, see id. (considering that the child's developmental and behavioral issues had improved once she had been removed from mother's custody in determining whether award of permanent custody to DHS was clearly erroneous), and that the foster parents who were relocating to Germany had closely bonded with the three children who had been in their care since their release from the hospital after birth.

V. CONCLUSION
Accordingly, the Order Awarding Permanent Custody and Letter of Permanent Custody, filed on November 7, 2007 in the Family Court of the First Circuit, is affirmed.
NOTES
[1] The Honorable James H. Hershey presided at trial and entered the three Orders.
[2] We base this factual background primarily on the Findings of Fact and Conclusions of Law (FsOF/CsOL) entered by the family court in each of the three cases on January 18, 2008. To the extent that some of those FsOF are contested here on appeal, we rely on them only if, as discussed further herein, we deem the arguments waived on appeal or have found the findings to be supported by the record.
[3] The adjudication of FC-S No. 06-10934 was held concurrently with the permanent plan hearings on the instant cases in November 2007; however, FC-S No. 06-10934 is not part of the instant appeal.
[4] KF was not a subject of the instant proceedings, but was the subject of a prior proceeding, FC-S No. 00-06576, involving Mother and Father.
[5] According to an April 7, 2005 Safe Family Home Report, when Mother returned, the social worker asked about a 1-inch scab on JF-2's chin. Mother said that JF-2 had been run over by a bike. As a result of the incident, JF-2 cut the inside of her cheek and her nose bled. The social worker reported that Mother did not appear sympathetic to JF-2's injuries, stating "this shit is because of her." Mother stated that she was not sending her children to preschool at the time in part because the children were subject to routine health checks when they were dropped off, and she was very upset when Father was arrested after dropping off JF-2 at school with bruises on her arm and leg. She stated she "don't need anyone telling her how to raise [her] kids."
[6] From the record, it appears that LL and JL remained in foster custody from their release from the hospital in April 2005 through the trial in November 2007.
[7] LF-1 reported his Father grabbing LF-1's leg, holding him upside down and kicking him in the head, his Father seizing LF-1 by the hair and smashing his face on the ground, and his Father hitting LF-1 with an umbrella and causing LF-1 to bleed as a result. LF-1 also reported observing his Father hit his Mother with a chair, and his Father throw a brick at his older brother. LF-1 also reported that his Mother had hit him with "a wire, a [hanger], a chair, a metal pipe, and wood."
[8] Father challenges the factual basis of this latter finding by the family court. However, a July 24, 2006 Safe Family Home Report indicates that JF-1 "reported `acts of physical abusiveness' by her father [in which] he hits her with a hanger, belt, slipper, and shoes." She also recounted a confrontation between Mother and Father in which Father threw a pot of food that hit LF-1. At trial, Mother testified that she agreed with testimony concerning that account of the discipline received by JF-1.
[9] According to an October 17, 2005 Safe Family Home Report, JF-1 was interviewed at the children's Justice Center of Oahu in August 2005 and reported that her maternal uncle had fondled her vagina on more than one occasion, had digitally penetrated her, and had exposed his penis to her.
[10] The family court found that Mother testified at the criminal trial that JF-1 "did not make the disclosure and/or question[ed] the credibility of [JF-1's] disclosure." At the trial in the instant matters, Mother testified that she believed that JF-1 had been sexually abused by KF and by Mother's brother.
[11] We discuss these concerns below.
[12] The Honorable Linda K.C. Luke presided.
[13] Any other points of error not specifically addressed herein are without merit.
[14] The family court conducted a thorough inquiry into the matter over the course of several hearings during which the parties and court discussed how they could prevent such a situation from recurring in the future. The five children were removed from the foster home and the parties pursued placement with an uncle.
[15] For example, Sato testified that LF-1 was angry because he was removed from his home, the experience of being in foster care, and "just everything else that goes along with it."
[16] Father also suggests that FOF 145 is erroneous because it is inconsistent with FOF 144; however, we disagree with his interpretation of FOF 145 and thus, reject that point of error.